DUPLEX PRINTING PRESS CO. v. DEERING et al.

(Circuit Court of Appeals, Second Circuit. May 25, 1918.)

No. 120.

1. INJUNCTION ⬪101(2)—CONSTRUCTION OF STATUTE—CLAYTON ACT—STRIKERS.

Where union employés of open shop go out on strike for closed shop, employer's action for injunction against officers and members of union organizations to which strikers belong *held* within Clayton Act, § 20 (U. S. Comp. St. 1916, § 1243d), relating to granting of injunctions in cases growing out of dispute concerning conditions of employment.

2. INJUNCTION ⬪101(2)—SECONDARY BOYCOTTS—STRIKES.

Clayton Act, § 20 (Comp. St. 1916, § 1243d), perhaps in conjunction with section 6 (section 8835f) *held* to legalize a secondary boycott, at least in so far as it rests on or consists of refusing to work for any one who deals with principal offender.

Rogers, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

⬪For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suit by the Duplex Printing Press Company against Emil J. Deering and others. Decree for defendants, and complainant appeals. Affirmed.

For opinion below, see 247 Fed. 192.

Complainant is a corporation organized and existing under the laws of the state of Michigan. It is engaged in the business of manufacturing printing presses at its factory in Battle Creek, Mich. It has always maintained the open shop policy, both in connection with its factory in Battle Creek and in supervising elsewhere the erection of its presses. When it is fully occupied, it operates ten hours a day, although in the winter it usually runs eight hours a day. Its presses are sold throughout the United States, and even in foreign countries. Special emphasis is placed by it on its manufacture of presses for metropolitan newspapers, which vary in weight from 10,000 pounds to 100,000 pounds, and which require from one to four railroad cars to transport them, and many drayloads to cart them to and from the freight yards. It is said that these presses are of a peculiar manufacture and are made under special patents with the result that the ordinary mechanic or pressman is not competent to erect or operate them, except under supervision and instruction of some one usually employed by the complainant, who is familiar with their structure and operation.

The defendants are officers and members of the International Association of Machinists. This association is divided into "districts" of which District Council, No. 15, in New York City, is one. Two of the defendants, Emil J. Deering and William Bramley, are business agents of District Council, No. 15. Michael T. Neyland is business agent of what is known as Local Lodge, No. 328, of the International Association of Machinists, existing and carrying on business solely within the city and state of New York. No jurisdiction was obtained over these unincorporated associations, as they were not served in the manner required by the statute. Deering, Bramley, and Neyland are members of the International Association of Machinists.

It is alleged that the International Association of Machinists is an unincorporated association of journeymen machinists, with a membership of over 60,000, and has affiliated therewith local unions and lodges in different states and territories of the United States, which are also unincorporated associations, and that each member of any local lodge is by virtue thereof a member of the International Association. District No. 15 of said International Association is one of the association's subdivisions and has its principal office in New York City. It is alleged that the Riggers' Protective Union is an unincorporated association of workingmen engaged in handling, hauling, and erecting machinery, etc., and has jurisdiction over all union men in New York City engaged in that business. It is alleged by complainant, although denied by defendants in their answer, that nearly all of the skilled machinists in New York City are members of the International Association of Machinists, and that nearly all of the riggers in New York City are members of the Riggers' Protective Union, and that the said union machinists and riggers are affiliated with another unincorporated association known as the Building Trades Council of New York City, and that said Building Trades Council is composed of the various unions in New York City whose members are engaged in the building business, and includes in its membership the unions of some 30 different trades, with an aggregate membership of from 75,000 to 100,000 members, and that, by virtue of the agreements and understanding existing between each of said unions, no member thereof is allowed to work on or in connection with any building where any nonunion man is employed, and said Building Trades Council is authorized to call strikes of all trades employed on or in connection with any building in the event that any nonunion man is employed in any of said trades, and that by reason of said rules and regulations and the affiliation of said 30 unions through the Building Trades Council it is practically impossible to erect any building in the borough of Manhattan where any nonunion man is employed in any of said trades.

The complainant states that it is informed and believes that the entire machinery of the Building Trades Council will be put into operation and effect against it, in order to prevent it from exhibiting or displaying its presses at the exposition conducted by the National Exposition Company, Incorporated, as hereinafter set forth, unless a restraining order be issued as prayed. The complainant states on information and belief that for many years past the International Association of Machinists and the local branches thereof, and the members and officers of said association and its branches, have been engaged in a combination and conspiracy to monopolize the machinists' trade throughout the United States, and to prevent the employment of any machinist who is not a member of said International Association, and that they have adopted various means and devices to prevent any employer procuring or retaining the necessary skilled organization for the production or installation of printing presses or the necessary customers for the sale thereof, unless said employers operate a closed or union shop and refuse employment to any machinist who is not a member of said International Association of Machinists, and that said conspirators have been so far successful in carrying out their said combination; that practically all manufacturers of printing presses of the kind and character manufactured by the complainant, with the exception of the complainant, have been compelled to comply with the demands of said conspirators, and to refuse employment to any person who is not a member of said International Association, and that for a number of years past the said conspirators have further combined and conspired together to attain their said monopolistic and unlawful ends by restraining, injuring, and destroying the complainant's interstate trade, business, and good will, and interfering with the sale, carting, and installation of the complainant's printing presses in New York state and the different states of the United States, for the purpose of destroying its interstate trade, contrary to the statutes of the United States and the state of New York in such cases made and provided, and contrary to the common law, because the complainant operates an open shop, and that all of the acts and doings of the said conspirators as described were done in furtherance of said conspiracy, and that if said conspirators are successful in destroying the complainant's business, because it is unwilling to become a member of said combination, such monopoly will have become complete, and no person will be able to secure employment in connection with the manufacture of printing presses of the kind manufactured by the complainant, except with the consent of the said International Association of Machinists.

It is alleged that in the month of August, 1913, a strike was called in complainant's factory by the defendants, or those acting in conjunction with them, in furtherance of said conspiracy, and 12 or 14 men quit work under orders of the union, without presenting any grievances or demands, or giving any notice, and that all of said men who quit work were members of said International Association of Machinists, and that immediately after said strike took place, and with like purpose and intent, said confederates placed pickets around said factory, to prevent the complainant from securing skilled machinists to take the place of those who had gone out on strike, and complainant is informed and believes that they have ever since persistently endeavored to induce other skilled machinists working for it at Battle Creek, or in connection with the installation of its presses in different parts of the country, to quit work, and have employed falsehoods, misrepresentations, threats, intimidation, and personal violence to induce employés of complainant to quit work, and to prevent other mechanics entering the employment of complainant, and has thereby been caused great and irreparable injury. It is also alleged on information and belief that the said conspirators have published and widely distributed letters and circulars among, and have made oral communications to, unions and teamsters, machinists, and pressmen, and their officers and members, and also to other kinds of mechanics or journeymen who do, or might have occasion to do, the work of hauling, handling, erecting, or operating printing presses, to the effect that complainant is unfair, and that no mechanics or craftsmen of any class could or should haul, handle, install, or operate printing presses produced by complainant, and

that all machinists are forbidden to handle, erect, or operate such presses, and that the object and effect of said circulars has been to incite union officers in all parts of the United States to induce, prevent, and forbid all members not to haul, handle, erect, or operate such presses, and to thereby cause loss and damage to any person or corporation purchasing complainant's presses, and to deter said persons and corporations from doing business with complainant for fear of labor difficulties, and the complainant has been thereby caused irreparable loss and damage.

It is also alleged on information and belief that said conspirators endeavored to prevent customers and those who might become customers of complainant from placing contracts with or purchasing printing presses from complainant, and they have threatened said customers with labor difficulties, which would injure their said business, if they patronized complainant, and they have made misrepresentations to complainant's customers, and those who might become customers, as to the labor conditions prevailing in its factory, and have made statements to the effect that organized labor would prevent complainant from installing said presses, and all of said statements have been made for the purpose of interfering with the complainant's interstate commerce trade and good will, and preventing it from securing orders and contracts in states outside of the state of Michigan, in order thereby to carry out the purposes of said conspiracy, and they have repeatedly ordered and caused strikes of mechanics and laborers employed by complainant and its customers in different states of the United States in connection with the hauling, erecting, and installation of presses manufactured by complainant, and they have thereby harassed, delayed, and damaged complainant and its customers, for the sole purpose of destroying complainant's interstate trade and business and compelling it to operate a union shop at Battle Creek.

The complainant claims that over 80 per cent. of its sales are made to customers outside of the state of Michigan, through the channels of interstate commerce. It also declares that most of its product is sold through salesmen in different states of the Union, who solicit orders and contracts from customers and forward them to complainant's office in Battle Creek for acceptance. It is also alleged that on account of the aforesaid combination and conspiracy, and the acts performed in furtherance thereof, the complainant has already suffered great loss and damage in its good will, trade, and business, and is suffering a continuing injury, and has no adequate remedy at law, because much of its said damage is incapable of definite proof for recovery in law, and because it would be necessary for the complainant to bring a multiplicity of suits against the great number of persons engaged in said conspiracy, and because many of said defendants are insolvent and would be unable to respond in damages, and because it is impossible for the complainant to ascertain the full extent to which its good will, trade, and business has been injured, and the name of each newspaper which has been deterred from placing contracts and orders with it by reason of the general rumors inspired by the defendants, for the purpose of frightening away any newspaper which might patronize its presses.

The complaint contains other allegations not necessary to incorporate herein. The relief prayed for is as follows:

"1. That the defendants Emil J. Deering and William Bramley, individually and as business agents of District No. 15 of the International Association of Machinists, Michael T. Neyland, individually and as business agent of Local Lodge, No. 328, of the International Association of Machinists, and Edward F. Nielson, individually and as business agent of Riggers' Protective Union, Jacob J. Keppler, individually and as vice president of the International Association of Machinists, their and each of their agents, servants, attorneys, confederates, and all persons acting in aid of or in conjunction with them, or any of them, or under their authority, suggestion, or direction, be restrained and enjoined from combining and conspiring together to monopolize the machinist trade, and from combining and conspiring together to prevent the employment of nonunion machinists, and from combining and conspiring together to injure the complainant's business, trade, and good will, and to prevent the complainant from securing skilled me-

chanics to carry on its said work of producing, hauling, and erecting print-ing presses for customers in New York state and other states outside of Michigan, and to prevent the complainant from securing orders and contracts for the sale and installation of printing presses, and from interfering with the sale, carting, installation, use, or operation of printing presses made by the complainant, and from doing any and all acts whatsoever in furtherance of said combination and conspiracy to accomplish any of the aforesaid pur-poses, and more particularly from. doing any of the following acts in fur-therance of said conspiracy:

"From publishing, circulating, or otherwise communicating, either directly or indirectly, in writing or orally, to any persons or corporation, any state-ment or notice of any kind or character whatsoever, calling attention to the fact that your complainant or its business or its products are or were or have been declared unfair, or are on any unfair list, or that your complain-ant should not be patronized or dealt with, or its printing presses purchased, used, handled, hauled, operated, worked upon, or dealt in, because made in an open or nonunion shop, and from publishing, circulating, or communicat-ing, either orally or in writing, any representation or statement of like ef-fect or import, in any manner that will injure or interfere with the com-plainant's business, or with the free and unrestricted right of the complain-ant to dispose of its printing presses, and to obtain contracts and orders for printing presses to be manufactured and installed by the complainant; from giving notice, verbally or in writing, to any person, firm, or corporation to refrain from soliciting, making, or carrying out contracts with complainant for the purchase, carting, installation, operation, exhibition, advertisement, or display of printing presses made by the complainant, under threats that, if such contracts or purchases are made or carried out, or such work is done, they will cause the person so notified loss, trouble, or inconvenience, or that they will interfere with and prevent the complainant from carrying out said contracts, or that they will cause persons employed by others to do work in connection with said presses, or upon buildings or in connection with exhibi-tions where said presses are to be displayed, used, or installed, to withdraw from work upon said building or in connection with said exhibitions, or that they will cause persons not to exhibit at said exhibition; and from attempt-ing to prevent the sale, carting, installation, use, operation, exhibition, or display of printing presses manufactured by complainant, or the perform-ance of contracts made by the complainant, by inducing or attempting to in-duce any person whomsoever to decline employment, or not to seek employ-ment, under any persons, firms, or corporations, or representatives of the complainant engaged in the work of hauling, carting, installing, handling, using, or operating said printing presses for customers, because the com-plainant does not observe union regulations in Battle Creek, Mich.; and from preventing or attempting to prevent the complainant from exhibiting its said presses at any exhibition or exposition, or advertising said presses, by threat-ening any persons or corporations having charge of such exposition or ad-vertising, or any person or corporation doing business with them, with labor difficulties or loss of patronage, if your orator is allowed to exhibit or ad-vertise, and from inducing any person or persons employed by said exposi-tion company or advertising agency, or any person or corporation doing business with them, to cease employment, or to decline employment, or to re-main out of employment of said exhibitors or exposition company as long as your complainant is allowed to take part in said exhibition; and from induc-ing any person or corporation not to do business with or work for any person or corporation, because such person or corporation may have, or purposes to have, or formerly had, business relations with complainant; and from in-citing or intentionally causing strikes or labor troubles among men employ-ed by customers, representatives, or agents of your complainant outside of Battle Creek, Mich., where no grievances exist against the complainant or its agents or customers other than the alleged grievance that the complainant does not operate its factory at Battle Creek, Mich., in accordance with the rules and regulations prescribed by the International Association of Ma-chinists, or any of its officers or subdivisions; and from threatening, intim-

idating, or assaulting persons in the employ of your complainant, or those engaged in hauling, installing, using, handling, or·operating machinery manufactured by your complainant, and from making misrepresentations or false statements, concerning the labor conditions existing in the complainant's factory, for the purpose of interfering with the complainant in securing skilled mechanics to enter or remain in its employ, or in securing orders and contracts from customers for the sale, installation, and use of printing presses; and from using any and all ways, means, and methods of doing any of the aforesaid forbidden acts, and from doing any of the forbidden acts, either directly or indirectly, or through by-laws, orders, directions, or suggestions to committees, associations, officers, agents, or otherwise."

Daniel Davenport, of Bridgeport, Conn., and Walter Gordon Merritt, of New York City (Austin, McLanahan & Merritt, of New York City, of counsel), for appellant.

Frank X. Sullivan, of New York City, for appellees.

Before ROGERS and HOUGH, Circuit Judges, and LEARNED HAND, District Judge.

ROGERS, Circuit Judge (after stating the facts as above). I am unable to concur with my Associates in the conclusion at which they have arrived, and which will appear in the opinion of Judge HOUGH, which follows. I shall, however, state the facts involved and my opinion as to the law applicable to the facts as I understand them.

The complainant is a manufacturer of printing presses. It employs 250 machinists in its factories in Michigan, and some 50 additional employés as traveling salesmen and as expert machinists in supervising the work of installing the presses in the places of business of the various purchasers of its machines. In carrying on its business it has always operated an "open" shop, without discrimination against any person employed in its factories on the ground that he was or was not a member of any labor union. It has observed the same policy in the employment of persons to supervise the installation of its presses. The complainant's presses are sold throughout the United States and in foreign countries. The presses which it builds are newspaper presses only, and they vary in size and capacity from a press that weighs 10,000 pounds to one that weighs 10 times that. A single freight car suffices to carry the smaller presses, while four cars are needed to transport the largest. Its presses adapted to metropolitan uses are capable of producing 30,000 complete papers an hour.

The testimony is that complainant has three competitors: R. Hoe & Co., of New York; the Goss Printing Press Company, of Chicago; and Walter Scott & Co., of Plainfield, N. J.—each of which operates a "closed" shop. The Hoe Company plant is understood to be the largest of these, and 10 times the size of that of the complainant's; the Goss Company's is about twice that of the complainant's, while the Scott Company's is more nearly equal to complainant's, although somewhat larger. There are no other builders of newspaper presses in the country, although there are builders of job presses of some kinds upon which small country newspapers are sometimes printed. The installation of the presses is a difficult undertaking. The installation of a press of the largest type requires the labor of five men

working for two weeks. The record shows that the men employed to install the presses are employed, not by the complainant, but by the complainant's customers. The acts complained of and sought to be restrained do not relate to the manufacture of the presses, but to the installation and operation of them. The claim is that the labor difficulties complained of have been due to the fact that complainant has refused to permit its machines to be manufactured in a "closed" shop. A "closed" shop is an establishment in which the employés are all members of a labor union; and an "open" shop is one in which no such condition of employment is imposed, and no discrimination between union and nonunion workers exists.

The International Association of Machinists, with which defendants are connected, is an unincorporated association of journeymen machinists, with a membership of over 60,000. It is not a party to this suit, and no relief is asked as against it. The defendants Deering and Bramley are sued individually and as business agents of District No. 15 of the International Association. District No. 15 is one of the subdivisions of the International Association. It is a voluntary organization, and embraces Local Lodges Nos. 328, 402, 406, 429, 434, and 721, each of which is a subdivision thereof, and each has its principal office in the city of New York, and each has jurisdiction over a certain group of the members of the International Association in that city. Neyland is sued individually and as business agent of Local Lodge No. 328, which is, as has been stated, in the city of New York. The defendant Nielson is sued individually and as business agent of the Riggers' Protective Union. That organization is also unincorporated, and it is an association of workingmen engaged in handling, hauling, and erecting machinery, and it has jurisdiction over all union men in New York City engaged in that business. The defendant Keppler, sued individually and as vice president of the International Association of Machinists, does not appear to have been served, and has interposed no answer. He is therefore not to be considered.

The important fact is to be noted that no one of the defendants is or ever was an employé of the complainant, and that no local lodge or union or officer or member of any union, in the place where the complainant manufactures its presses, has been made a party defendant herein. The parties defendant are residents and citizens of New York, except the defendant Bramley, who is a resident and inhabitant of New Jersey, and the unions with which they are connected are local to New York and vicinity.

It is the duty of courts to protect the life, liberty, and property of all within their jurisdiction. Courts are not respecters of persons, and the rights of employers and those of employés are entitled to equal protection. Liberty of contract is a constitutional right secured to employers and employés alike. It consists in the ability at will to make or abstain from making a binding obligation. The employé has the right to choose his employer. The employer has the like right to choose his employé. The defendants insist that all they have done has been to exercise the right, which they claim for the organizations which they represent, to say that their members shall not work for

the complainant or handle the complainant's product; in other words, that it is their right to say for whom their members shall work and upon what they shall work. The complainant denies that that is the sole question which the facts present.

In England some years ago, in Skinner v. Kitch, 10 Cox, C. C. 493, Blackburn, J., said that:

"A greater piece of tyranny than to insist that a master shall have his work stopped unless he consent to punish men who are his journeymen for refusing to belong to a union cannot well be."

In the above case an indictment and conviction were sustained for threatening that nearly all the employer's workmen would quit work unless he dismissed a nonunion employé or compelled him to join the union.

The question came before the Supreme Court of the United States in 1917 in Hitchman Coal & Coke Company v. Mitchell, 245 U. S. 229, 38 Sup. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497. As the jurisdiction of the District Court, from which the case came, was based solely upon diversity of citizenship, the decision was reached upon the common law of the state of West Virginia; there being no statute governing the matter. The company brought suit to enjoin the defendants, who were sued as individuals and as officers of the United Mine Workers of America and of its local branches, which had jurisdiction over the territory within which the plaintiff's mine was situated. The District Court granted an injunction as prayed. 202 Fed. 512 (1912). The Circuit Court of Appeals reversed the case and dismissed the bill. 214 Fed. 685, 131 C. C. A. 425 (1914). And the Supreme Court reversed the Circuit Court of Appeals, and affirmed the decree of the District Court, with slight modifications. As modified, the defendants were restrained from "interfering or attempting to interfere with plaintiff's employés for the purpose of unionizing plaintiff's mine without its consent, by representing or causing to be represented to any of plaintiff's employés or to any person who might become an employé of plaintiff, that such person will suffer or is likely to suffer some loss or trouble in continuing in or in entering the employment of plaintiff, by reason of plaintiff not recognizing the union, or because plaintiff runs a nonunion mine," as well as certain other acts which need not here be specified. In the above case the employés do not appear to have been employed for any definite period of time, but in applying for work they were required, as a condition of obtaining employment, to agree that they would not, while in the service of the company, be a member of the union, and if they joined the union that they would withdraw from the company's employ.

The case of Eagle Glass & Manufacturing Company v. Rowe, 245 U. S. 275, 38 Sup. Ct. 80, 62 L. Ed. 286, decided at the same time the Hitchman Case was, involved very much the same question, and the court reversed the Circuit Court of Appeals, which held that no injunction should issue, and dismissed the bill. The Supreme Court held its action erroneous:

"(a) Because plaintiff was entitled by law to be protected from interference with the good will of its employés, although they were at liberty to

quit the employment at pleasure; (b) because the case involved no question of the rights of employés, and their right to quit the employment gave to defendants no right to instigate a strike; and (c) because the methods pursued by the defendants were not lawful methods."

The above decisions very much restrict the right of labor unions to interfere with employers of labor in the management of their business; and this court must follow the law as laid down by the court in all cases to which it is applicable. But the decision goes upon the common law of West Virginia; there being no statute affecting it and no authoritative decision of the courts of that state.

In Berry v. Donovan (1905) 188 Mass. 353, 74 N. E. 603, 5 L. R. A. (N. S.) 899, 108 Am. St. Rep. 499, 3 Ann. Cas. 738, an agreement had been entered into by shoe manufacturers with the Boot and Shoe Workers' Union, a national organization, to hire as shoe workers only members of that organization. It was also agreed that the manufacturers would not retain any shoe worker in their employment after receiving notice from the union that a worker was objectionable to it, either on account of being in arrears for dues, or disobedience of union rules, or from any other cause. It seems that after this agreement had been made the union demanded that a certain employé, who had been working for the manufacturers for several years prior to this agreement, and who was not a member of the union and refused to join it, should be discharged. This was done, and the employé brought an action for damages against the defendant, who was the representative of the Boot and Shoe Workers' Union, and who demanded and procured his discharge. The court sustained a judgment against the defendant for $1,500, and held that the fact that the plaintiff's employment was not terminable at the will of the employer was material only as to the amount of the damages. The object was to make the plant a "closed" shop. The court said:

"If such an object were treated as legitimate, and allowed to be pursued to its complete accomplishment, every employé would be forced into membership in a union, and the unions, by a combination of those in different trades and occupations, would have complete and absolute control of all the industries of the country. Employers would be forced to yield to all their demands, or give up business. The attainment of such an object in the struggle with employers would not be competition, but monopoly. A monopoly, controlling anything which the world must have, is fatal to prosperity and progress. In matters of this kind the law does not tolerate monopolies. The attempt to force all laborers to combine in unions is against the policy of the law, because it aims at monopoly."

The court was unanimous in its opinion. See, also, Plant Martell v. White, 185 Mass. 255, 69 N. E. 1085, 64 L. R. A. 260, 102 Am. St. Rep. 341.

In Connors v. Connolly (1913) 86 Conn. 641, 86 Atl. 600, 45 L. R. A. (N. S.) 564, it was held in a carefully considered case that a contract entered into by the United Hatters of North America and substantially all the manufacturers of hats in Danbury, to the effect that union workmen only should thereafter be employed, is contrary to public policy. The tendency of such an agreement, the court said, is to expose a nonunion workman to the tyranny of the will of others,

and to create a monoply which would exclude what he has to dispose of, and other people need, from the open market, or perhaps from any market. The plaintiff in that case was a hat maker in Danbury, and was discharged from employment and prevented from getting work by the concerted acts of the defendants, members of a labor union, who attempted to justify their conduct under the agreement not to employ nonunion workmen. The attempted justification failed; the court, reviewing the subject in an exhaustive and carefully reasoned opinion, concluded that the agreement was void, as opposed to sound public policy.

A contrary view of the matter was taken in Kemp v. Division No. 241 (1912) 255 Ill. 213, 226, 227, 99 N. E. 389, 394 (Ann. Cas. 1913D, 347), where it was said in an opinion written by Cooke, J.:

"If it is proper for workmen to organize themselves into such combinations as labor unions, it must necessarily follow that it is proper for them to adopt any proper means to preserve that organization. If the securing of the closed shop is deemed by the members of a labor union of the utmost importance, and necessary for the preservation of their organization, through which alone they have been enabled to secure better wages and better working conditions, and if to secure that is the primary object of the threat to strike, even though in the successful prosecution of the object of the combination injury may result incidentally to nonunion men through the loss of their positions, that object does not become unlawful."

The opinion of Judge Cooke was concurred in by two other members of the court. Three judges dissented. The sole purpose of the strike in that case was to insure the employment of union men, and to compel the discharge of certain employés who had withdrawn from the union. The conclusion reached by Judge Cooke became the decision of the court by its acceptance by Judge Carter, who cast the deciding vote and wrote a separate opinion, in which he stated that he concurred in the final conclusion, but not in all the reasoning. He appears, however, to have thought that the threatened injury to the complainants was justifiable as an act of competition, and that, even if the purpose of the strike were unlawful, so that defendants would be liable in a civil action if complainants were discharged, still an injunction should not issue, as that would be in effect to compel them to continue in their employer's service unwillingly. The dissenting judges stated that the result reached was contrary to the law of Illinois as declared in repeated decisions covering a period of 14 years, citing Doremus v. Hennessy, 176 Ill. 608, 52 N. E. 924, 54 N. E. 524, 43 L. R. A. 797, 802, 68 Am. St. Rep. 203, and London Guarantee & Accident Co. v. Horn, 206 Ill. 493, 69 N. E. 526, 99 Am. St. Rep. 185. They held that the right of a labor organization to enforce a "closed" shop for the mere purpose of strengthening the organization in future contests with the employer is not of the same character as, or equal to, the right of the individual to dispose of his labor at his own will.

In Gray v. Building Trades Council (1903) 91 Minn. 171, 97 N. W. 663, 63 L. R. A. 753, 103 Am. St. Rep. 477, the whole controversy rested on the effort of defendants to compel the plaintiffs to employ union labor only. The question was whether the efforts made in that direction were legitimate to the doctrine that members of labor unions

may singly or in a body quit the service of their employer, and for the purpose of strengthening their union persuade and induce others in the same occupation to join it, and as a means to that end refuse to allow their members to work in places where nonunion labor is employed. This the court declared to be legitimate and refused to enjoin, although it held that boycotting might be restrained by injunction.

In Bossert v. Dhuy (1917) 221 N. Y. 342, 355, 117 N. E. 582, the court referring to National Protective Association v. Cumming, 53 App. Div. 227, 230, 65 N. Y. Supp. 946, declared that it was clearly established in that case that workingmen may organize for purposes deemed beneficial to themselves, and in that organized capacity may determine that their members shall not work with nonmembers, or upon specified work or kinds of work. It declared that:

"An association of individuals may determine that its members shall not work for specified employers of labor. The question ever is as to its purpose in reaching such determination. If the determination is reached in good faith, for the purpose of bettering the condition of its members, and not through malice or otherwise to injure an employer, the fact that such action may result in incidental injury to the employer does not constitute a justification for issuing an injunction against enforcing such action."

The court in the above case passed upon the rights of labor unions under the common law of the state of New York, which is the state in which most of the acts complained of were done, and where the defendants, except Bramley, reside. It decided that it was not illegal for the United Brotherhood of Carpenters to refuse to allow its members to work with nonunion men, and that it was not illegal for it to refuse to allow its members to work in the erection of materials furnished by a nonunion shop. A case is only authority for what it actually decides, and it has been frequently said that every decision is to be read as applicable to the particular facts proved, since the generality of the language of an opinion is not intended as an exposition of the whole law, but is to be understood as governed by the particular facts of the case which is decided. In the case before the New York court it was passing upon a general rule applicable to all nonunion mills, and to all nonunion-made materials. And the court took pains to point out (221 N. Y. 355, 117 N. E. 584) that a general rule of this sort "differs entirely from a general boycott of a particular dealer or manufacturer with a malicious intent and purpose to destroy the good will or business of such dealer or manufacturer."

The question whether a labor organization can call those of its members out on strike who work for A. because he maintains a closed shop, while permitting other members to work for B., C., and D., who also maintain closed shops in the same industry, is not the same question as that which arises when it calls out all its members who work for A., B., C., and D., and for any one else who maintains a closed shop. As we understand the New York decision, the court dealt in that case with labor organizations which made no discrimination, but applied its rules to all alike. The members were not to work for any one who maintained an open shop, and they were not to work upon any material which came out of any open shop. In the case now in this

court the record contains the testimony of the president of the Exposition Company in New York City, who said Deering told him they were going to enforce the union closed shop rule against complainant, "because it was their opportunity of getting back at Mr. Stone, the president of the company." He also testified that Neyland told him "that Stone had driven his brother out of Battle Creek, so that his brother could not get a job there, and he wanted to get back at him." When the president asked them whether anybody else in the show was on the unfair list, "they mentioned the Oswego Machine Company, stating that they might follow the same policy with that as with Mr. Stone, but they did not think they would bother about it; that Stone was fundamentally the one against whom they wanted to enforce this ruling in this show." It does not appear, however, that the Oswego Machine Company was in the same industry with the complainant. On the cross-examination the complainant's president, however, testified as follows:

"I know that the Machinists' Union was endeavoring to have this done in all the plants in the country where our industry was involved, and that they were asking the same from us as they were asking from the Hoe Company, the Goss Company and the other printing press manufacturers, so that we were not selected from the printing trades industry for these demands or the attempts to enforce them, and I understood that the Goss Company, the Hoe Company, and the Scott Company, at Plainfield, had all granted these conditions, so that the last one in which any drastic efforts were made to create the eight-hour day and establish a minimum scale was our concern."

It may be conceded that the defendants were endeavoring to establish uniform conditions in the industry in which the complainant was engaged. It follows, therefore, that under the New York law, as expounded by the New York Court of Appeals, the defendants were within their rights, unless there are other circumstances which make the rule laid down in that case inapplicable.

It is said the defendants are not engaged in a peaceful strike, but in an alleged boycott, and that their conduct seeks to coerce complainant's customers, who are in turn to coerce the complainant into unionizing its business against its will.

A strike and a boycott are two quite distinct matters. A strike is an effort on the part of employés to obtain higher wages, or shorter hours, or a closed shop by stopping work at a preconcerted time. It is an attack made by employés upon their employer, by labor upon capital. But a boycott made by union labor against a product manufactured by nonunion labor is an attack upon both labor and capital. It is union employés on the one side and nonunion employés and the open shop employer on the other. The principles applicable to a boycott are not applicable to a strike. The strike in Battle Creek may be lawful, while the boycott of the product in New York may be unlawful. The use of the boycott is very generally held to be the use of unlawful means, and it is not material, where it is resorted to, whether the end which is sought—in this case the unionizing of the shops in Michigan—is lawful or not.

A boycott is a combination formed to injure the trade, or business, or occupation of another, by preventing other persons from doing busi-

ness with him, by threatening injury to the trade, business, or occupation of those who have business relations with him. And in Martin's Modern Law of Labor Unions, p. 104, it is said that:

"If the things done, or the words spoken, are such that they will excite fear or a reasonable apprehension of damage, and so influence those for whom designed as to prevent them from freely doing what they desire, and the law permits, they may be restrained, and the courts will look beyond the mere letter of the act or word into its spirit or intent."

And see State v. Stockford, 77 Conn. 227, 58 Atl. 769, 107 Am. St. Rep. 28; Purvis v. United Brotherhood of Carpenters and Joiners, 214 Pa. 348, 63 Atl. 585, 12 L. R. A. (N. S.) 642, 112 Am. St. Rep. 757, 6 Ann. Cas. 275; State v. Stewart, 59 Vt. 273, 9 Atl. 559, 59 Am. Rep. 710; Wilson v. Hey, 232 Ill. 389, 83 N. E. 928, 16 L. R. A. (N. S.) 85, 122 Am. St. Rep. 119, 13 Ann. Cas. 82; Beck v. Railway Teamsters' Protective Union, 118 Mich. 497, 77 N. W. 13, 42 L. R. A. 407, 74 Am. St. Rep. 421.

In Quinn v. Leathem, [1901] A. C. 495, Lord Lindley, in the House of Lords, declared that a threat to call men out given by a trade union official to an employer of men belonging to the union and willing to work with him "is a form of coercion, intimidation, molestation, or annoyance to them and to him very difficult to resist." And if the defendants are engaged in an unlawful conspiracy to destroy the complainant's business, it is as though they were in a conspiracy to destroy the complainant's presses, for its business is as much property, and as much entitled to protection, as are the presses. In Martin's Modern Law of Labor Unions, § 84, the law is stated as follows:

"A person's business, aside from the money, chattels, plant, or other tangible property employed therein, is in every sense of the word property, and as such is, if lawful, entitled to protection from all unlawful interference, whether the object of that interference be to compel customers or prospective customers to refrain from patronizing him, or persons dealing in material or products necessary to his business to refrain from furnishing him therewith, or to restrain workmen from furnishing him with the labor necessary to such business."

It appears that certain persons officially connected with the International Association of Machinists, one of the defendants herein, called at complainant's office and stated that they noticed that complainant was ready to ship a press to the New York World, and that unless it unionized its factory at Battle Creek they would see that the press never turned a wheel in New York City, and that no teamster in New York would be allowed to handle or have it. The press was delivered at the office of the World after dark to avoid trouble, and the defendant Keppler on the same night called on complainant's president in New York and stated that all the men employed on it would be called out on strike that night and would not return to work the following morning. As a result of argument between the two men that threat was withdrawn, and the work of installation was allowed to proceed.

In December, 1913, the Italian Herald, of New York City, purchased a press of complainant. The defendant Deering arrived at the office of that paper before the press arrived, and informed those in charge of the paper that they had no right to purchase a press from the

complainant, as it knew it maintained an open shop, and that as soon as the press arrived "we will give a trouble for the Italian Herald and the Duplex, and we try to make all the trouble possible to the Duplex." The trouble was made as promised. The trucking company was told not to handle any more of the press after a part of it was delivered. Deering stated that the members of different building trade unions that were at work on the building would be called off on strike. The owner of the building feared that the completion of the building would be held up for two or three weeks if the Herald went on with the installation of the press, and said that it would have to be discontinued until after the union men in all the other trades "had completed their work on the building and left entirely," as the other trades would be ordered out on strike. The work of installation was stopped until Saturday afternoon, and then it was completed by working that afternoon and night and Sunday morning, when the men employed on the building were not working. The defendant Deering the next day told the complainant's representative:

"You put one over on me this time, but you will never do it again, and I am going to make it more and more difficult for the Duplex Printing Press Company to make installations, and will interfere with their work in every way possible. I am very sorry for the salesmen; it is going to be more difficult for the salesmen to get orders for Duplex presses."

In February, 1914, the Italian Herald put in another of complainant's presses, and when the press was being carted to the Herald's office Deering instructed the truckman to quit work, and the delivery of the press was stopped. Later, when the press was delivered and was being installed, Deering informed two of the workmen that they had better quit or he would take their cards away. When they refused, he walked out, saying, "Very well, my laddie." On the following day, when these two men were on their way home from their work, they were struck from behind and knocked senseless on the sidewalk about a block away from the building in which they had been at work. One of the men testified that "two or three men assaulted us, clubbed us, kicked us, and left us unconscious on the sidewalk." They did not know the men who assaulted them, and it does not appear that they were connected with the defendants; but, as the motive does not appear to have been robbery, the inference that the assault grew out of the pending difficulties is perhaps not unnatural.

The New York Law Journal purchased one of complainant's presses, and Deering at once informed those in charge of that publication that they would not be able to have the press hauled to their plant. When the press was delivered at the Journal's place of publication, and after several crates had been carried into the building, Deering made his appearance upon the scene and said, "Here, I told you fellows not to do this; you know you should not do it"; and he directed the truckmen "to quit the job," which they did. He also informed the Journal people:

"That he was going to do all possible to prevent the wheels of the Law Journal press revolving. If he could help it, the press would never be started up in the city of New York. He said that the unions had unlimited financial means with which they could fight the Duplex Printing Press Company,

and which they were to use for that purpose; that eventually the Duplex Company would have to give in to the union, as other manufacturers had given in to the union."

The complainant sold a press to the Bolletino della Sera, at New York City, and the work of erection was supervised by one Young. Deering told him not to erect the machinery and after he started to unload it ordered the men that were working with him to quit work, which they did. They stopped at Deering's direction, when they were unboxing and cleaning the machinery and carrying it into the building. A half a load of machinery was left on the sidewalk, and had to be loaded on the dray again and taken away. A day or two later Deering again met Young and stated he would do everything he could to prevent that machinery going into the Bolletino della Sera, and that he had notified the repair shops in that locality not to do any repairing on that machinery. He also said that he had heard of one or two breakdowns on Duplex machinery lately, and that there would be more the first of the year, as they were going to take aggressive action against the Duplex Company; that there was a prospective purchaser for Duplex machines in the Bronx, but that he had put a stop to that deal.

The complainant sold a press to Nicolletti Bros. in New York City. Deering asked Young, who was to supervise its installation, if he sided with the union or the Duplex Company, and Young, who was a member of the Machinists' Union, replied that he sided with the Duplex Company. Deering told Young he did not have to look after the installation of that machine, and that he could send word to the complainant that he was afraid to install it. Young replied that this would be untrue, but Deering stated that he "had good reasons to be afraid to look after the Duplex Printing Press Company's work." Deering stated to Young that he would take his card away from him and would blacklist him as a scab all over the East. He told Young as a member of the union not to work upon the machinery of the Duplex Company. He followed Young down to the office of the trucking company, and directed the truckman "not to haul the machinery"; that "it would make trouble" for him if he did. The truckman accordingly refused, because Deering "would pull the men off the job." One of the men was told that he was to stay away from the job, because something was going to happen, and that if they got hold of him that he could prove an alibi.

The Plainfield Press, of Plainfield, N. J., purchased a press from the complainant, and had so much trouble in getting it installed that it declined to consider making further purchases from complainant, and on December 3, 1915, it wrote complainant as follows:

"You will perhaps remember that we had considerable difficulty, and not a few subscriptions stopped, when we put the Flatbed Duplex in, * * * and we do not care to encounter anything of that kind again. There are a large number of union machinists in this city, and the union is recognized by practically every shop, so that we do not care to run any risks again."

The complainant had a contract with the National Exposition Company of New York City, which entitled it to place its presses in an

exhibit to be made in the Grand Central Palace in that city. The defendant Deering informed the president of the Exposition that a strike would be called if any exhibits were unloaded or installed in any of the trades except by union men. When he was informed that some of the exhibits could not be put in place by his men, because they would not know how to erect the machinery, and would have to stand around and draw money while other men did the work, he replied:

"Anyhow you will have to hire our men, whether they can or not, or else there will not be anything else unloaded, or there will not be any machinery put up."

He informed the president of the Exposition that the complainant "could not exhibit and he would not allow them." The testimony of the president of the Exposition is:

"I said, 'Do you realize that in doing it [excluding the complainant] you are apt to ruin my business?' And they said, 'Yes; but they could not help it, and the only way out of it was to cancel the Duplex contract.' I said I could not do that, as I had a legal contract, and Deering said, 'You have got to cancel it, or else there will be a strike on this show, if they try to put that exhibit in.'"

The Exposition was to receive $675 under its contract with the complainant, which it did not want to lose, and Deering was asked, if the contract was canceled, whether the Machinists' Union would make good what the Exposition Company lost, or would stand any damages it might sustain if sued for a breach of contract. The answer was that the Machinists' Union would do nothing.

The Charles Britton Trucking Company was usually employed to haul heavy presses and machinery in New York, and the head of the company testified that he was informed by defendant Deering that the company was not to haul any Duplex presses, and if it did there would be trouble. When the company undertook to haul the presses, Deering appeared and called the men off the job.

The testimony shows, not simply that union men have been instructed not to haul or install the complainant's machines as being the product of an unfair shop, but that coercion has been resorted to, by threats of taking their cards away (a very serious matter for a union man), and by telling them that they had good reasons to be afraid to look after the work of the Duplex Printing Press, and that they would blacklist the men as scabs and make trouble for them; and men under most suspicious circumstances have been assaulted and felled unconscious to the ground. They have intimidated complainant's customers by threats to call out men engaged in other trades. The members of different building trade unions would be called off on strike and compelled to quit work on a building not yet completed, and in which it was intended to install a press manufactured by complainant, so that the owner of the building feared the work on the building would be held up two or three weeks. Pickets were employed. No repairs were to be made on machines installed. Threats of putting the machines out of order were likewise indulged in by defendants. The defendants in at least one instance sought to obtain the cancellation of one of complainant's contracts; and they have sought by direct and indirect

252 F.—47

means to prevent customers from buying any of complainant's machines. The facts of the case seem to us to be very different from the facts which appear in Bossert v. Dhuy, supra. There was no attempt in that case to cancel contracts, no attempt to coerce union men to quit their jobs, no attempts to commit violence.

In Quinn v. Leathem, [1901] A. C. 495, a trade union notified Leathem that they would not work for him unless he unionized his shop. This he refused to do, and the union thereupon notified one of his customers that they would not work for the latter if they bought Leathem's goods. Thereupon the customer ceased to buy from Leathem, who brought suit against members of the union. It was held by the House of Lords that Leathem was entitled to recover. The Earl of Halsbury in his opinion said:

"If upon these facts, so found, the plaintiff could have no remedy against those who had thus injured him, it could hardly be said that our jurisprudence was that of a civilized community."

The case shows that the injury inflicted upon the complainant was without any justification whatever. And Lord Macnaghten in the same case said that the defendants conspired to do harm to Munce (customer) in order to compel him to do harm to Leathem, and so enable them to wreak their vengeance on Leathem's servants, who were not members of the union. So in the case at bar defendants propose to injure complainant's customers in New York, in the hope that they will bring pressure to bear upon the complainant in Michigan, to the end that it will discharge all nonunion workmen from its factories in that state.

In Hopkins v. Oxley Stave Co. (1897) 83 Fed. 912, 28 C. C. A. 99, the Circuit Court of Appeals for the Eighth Circuit said:

"The right of an individual to carry on his business as he sees fit, and to use such implements or processes of manufacture as he desires to use, provided he follows a lawful avocation, and conducts it in a lawful manner, is entitled to as much consideration as his other personal rights; and the law should afford protection against the efforts of powerful combinations to rob him of that right, and coerce his will by intimidating his customers and destroying his patronage."

In Iron Molders' Union v. Allis-Chalmers Co. (1908) 166 Fed. 45, 91 C. C. A. 631, 20 L. R. A. (N. S.) 315, the Circuit Court of Appeals in the Seventh Circuit declared that striking workmen may not coerce third persons, not directly concerned in the strike, in refusing to buy or use the products of their late employer, any more than he may lawfully coerce third persons into refusing them shelter or food, but the only means of injuring each other which are lawful in such contest are those that operate directly and immediately upon the control and supply of work to be done and of labor to do it; and the court said that attempts to injure each other by coercing members of society who are not directly concerned in the pending controversy to make raids in the rear cannot be tolerated by organized society, for the direct; the primary, attack is upon society itself. In the case at bar the immediate injury is to the New York purchasers of complainant's presses, and the refusal to allow union labor to be employed in their installation is not because of any dispute with the New York owners of the presses, or to

raise wages in New York, or to shorten hours there, but is to coerce the New York customers, so that they will coerce the manufacturer in Michigan.

In American Federation of Labor v. Buck's Stove & Range Co. (1909) 33 App. D. C. 83, 32 L. R. A. (N. S.) 748, an injunction was granted to restrain a conspiracy which threatened damage to persons having business dealings with the complainant, and to restrain threats which tended to prevent others from freely transacting business with it. The principle upon which the decision went was that interference by a labor union with another's patronage is not justified by the fact that the remote object sought is a benefit to its own members. And an appeal to the Supreme Court of the United States was dismissed in 219 U. S. 581, 31 Sup. Ct. 472, 55 L. Ed. 345 (1911), on the ground that the question involved had become moot because of a settlement between the parties. In the opinion of Mr. Justice Robb of the Court of Appeals he said:

"It matters not that the remote object of the combination was to benefit such members of the local unions as should be employed by complainant, because the law looks to the immediate, and not to the incidental, object of the combination. If the immediate object is unlawful, the combination is unlawful. If the immediate object is lawful, as in the case of legitimate trade competition, including strikes, the combination, generally speaking, is unlawful."

In Pickett v. Walsh (1906) 192 Mass. 572, 78 N. E. 753, 6 L. R. A. (N. S.) 1067, 116 Am. St. Rep. 272, 7 Ann. Cas. 638, it was said that a refusal to work for A. with whom the strikers have no dispute, because A. works for B. with whom the strikers have a dispute, for the purpose of forcing A. to force B. to yield to the strikers' demands is without legal justification and may be enjoined.

In Burnham v. Dowd (1914) 217 Mass. 351, 104 N. E. 841, 51 L. R. A. (N. S.) 778, the doctrine of Pickett v. Walsh, supra, was adhered to, and the plaintiffs were held entitled to an injunction restraining defendants from threatening to strike or to leave the work of any owner, builder, or contractor by reason of such persons having purchased masons' supplies from the plaintiffs or having dealt otherwise with the plaintiffs, and from ordering or inducing any strike against an owner, builder, or contractor for such reason. It was in intention and effect a boycott.

In Purvis v. United Brotherhood of Carpenters and Joiners (1906) 214 Pa. 348, 63 Atl. 585, 12 L. R. A. (N. S.) 642, 112 Am. St. Rep. 757, 6 Ann. Cas. 275, the purpose of the defendants was to compel the plaintiffs to unionize their mill by working injury to their business. The right of the plaintiffs to an injunction was upheld, and defendants were restrained from representing to the plaintiff's customers that they were likely to suffer loss or trouble in their business for purchasing building materials from the plaintiffs, and—

"from attempting by any scheme, combination, or conspiracy, among themselves or with others, to annoy, hinder, or interfere with or prevent any person or persons or corporation from purchasing building materials, or making contracts for the purchase of the same, from the plaintiffs, and from

any and all acts * * * which, * * * by putting or attempting to put any person or persons or corporation in fear of loss or trouble, will tend to hinder, impede, or obstruct the plaintiffs from making sale, or making contracts for sale, of building materials," etc.

In Door Co. v. Fuelle (1908) 215 Mo. 421, 114 S. W. 997, 22 L. R. A. (N. S.) 607, 128 Am. St. Rep. 492, it was held that a combination to injure or destroy the trade, business, or occupation of another by threatening or producing injury to the trade, occupation, or business of those who have business relations with him is an unlawful conspiracy which can be restrained by injunction. The court also held that combinations between the officers and members of a labor union, or between such union and its executive officers and kindred associations, having for its direct object the immediate effect to injure and damage the business of persons at whom they are directed, and thereby to compel them to discharge their nonunion employés and replace them with members of the union, and thereby incidentally and indirectly to benefit the parties to the combination is an unlawful conspiracy.

In concluding this phase of the subject, it appears that, although the defendants were engaged in an undertaking which the law of New York recognizes as legitimate, the unionization of complainant's factories, they have resorted to measures in the accomplishment of that end some of which the law does not countenance. The law does not permit either party to a labor dispute to use force, violence, threats of force, intimidation, or coercion; and words or acts which are calculated to cause one to fear injury to his person or to his business are equivalent to threats. Moreover, the law does not permit any attempt to be made to cancel contracts which an employer has made with third persons.

There is, as we have seen, evidence of threats to call out men in the building trades from work on a building under construction for a customer of the complainant, because a press made by the complainant was about to be installed in the building. A strike of that kind is a sympathetic strike; that is, one in which the striking employés have no demands or grievances of their own, but strike for the purpose of indirectly aiding others, having no direct relation to the advancement of the interests of the strikers, and courts have held that such a strike is an unjustifiable invasion of the rights of the employer. Labatt on Master and Servant, vol. 7, p. 8346 (Ed. 1913).

But there is, in conclusion, another phase of the matter, and one which is not the least important, which remains to be considered. The complainant is engaged, as we have seen, in the business of manufacturing printing presses in its factories in the state of Michigan. But it is also engaged in interstate commerce, as over 80 per cent. of its presses are sold to customers outside the state. The defendants, not being able to prevent the complainant from manufacturing its presses in its factories in Michigan by nonunion workers, who are contented with their hours and their wages, have sought, it is charged, to restrain its trade and commerce by making its products nonsalable in other states by the means already set forth in this opinion. The action of defendants is claimed to be contrary to the anti-trust legislation of Congress.

The Sherman Anti-Trust Act of 1890 (Act July 2, 1890, c. 647, 26 Stat. 209) had its origin in the evils of massed capital, but the intent of Congress in its enactment was that the channels of interstate commerce should be kept free from all unreasonable obstruction whether of capital or labor. The interdiction laid upon capital was laid also upon labor, and embraced all combinations which placed obstructions in the currents of commerce between the states.

In Loewe v. Lawlor (1908) 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815, the defendants had sought to unionize the plaintiff's factory by first instituting a strike to prevent production, and then by driving his nonunion products out of interstate commerce through a boycott which rendered those products unsalable in the different states. The ultimate object was, in that case as in this, to unionize the plaintiff's factory; but the court held illegal any combination whatever to secure action "which essentially obstructs the free flow of commerce between states, or restricts in that regard the liberty of a trader to engage in business," and it held that a combination of labor organizations and the members thereof to compel a manufacturer whose goods are sold in other states to unionize his shops, and, on his refusal to do so, to boycott his goods and prevent their sale in states other than his own until such time as the resulting damage forced him to comply with their demands, was a combination in restraint of interstate trade or commerce within the meaning of the Sherman Act. The case was again before the court in Lawlor v. Loewe (1914) 235 U. S. 522, 35 Sup. Ct. 170, 59 L. Ed. 316, and it was again affirmed that the conduct of the labor organization was within the prohibition of the Anti-Trust Act of 1890. In both cases the decision of the court was unanimous; Chief Justice Fuller writing the opinion in the first case, and Mr. Justice Holmes writing in the second case.

In Eastern States Lumber Association v. United States (1914) 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788, the court held that the circulation of a so-called official report among members of an association of retail dealers calling attention to actions of listed wholesale dealers in selling direct to consumers tended to prevent members of the association from dealing with the listed dealers referred to in the report, and to directly and unreasonably restrain trade by preventing it with such listed dealers, and was within the prohibitions of the Sherman Law.

In Paine Lumber Co. v. Neal (1917) 244 U. S. 459, 37 Sup. Ct. 718, 61 L. Ed. 1256, an injunction was asked to enjoin what was alleged to be a conspiracy to restrain interstate commerce. The bill was brought by certain corporations engaged in the manufacture of doors, sash, etc., in open shops, against the representatives of the United Brotherhood of Carpenters and Joiners of America and others. The unions had entered into an agreement not to erect material made by nonunion mechanics, and because of the refusal of union men to work with nonunion men, and because employers quite generally found it to their interest to employ union men, it became largely unpracticable to erect carpenter work except by union labor. An injunction was asked to prevent the defendants from conspiring to refuse to work upon mate-

rial because not made by union labor. It involved an attempt to drive open shop products out of commerce, and in that respect the case resembles the one before the court. The majority opinion, as we understand it, does not decide whether the acts complained of constituted a violation of the Sherman Act. The minority opinion of three of the justices did not hesitate to say that the acts were in restraint of interstate commerce and were prohibited by the Sherman Law. The case arose in this circuit and we affirmed the action of the District Court which dismissed the bill. The Supreme Court affirmed the decree on the ground that under the Sherman Anti-Trust Act, if the acts complained of amounted to a violation of that act, a private person could not maintain a suit for an injunction under section 4 of that act. 8 U. S. Compiled Statutes Ann. 1916, p. 9655. There seems to be an intimation in the dissenting opinion (page 473) that the court as a whole thought that the facts showed a violation of the Sherman Act. If the court had actually so decided this court would be bound to hold it decisive, and that the defendants' conduct in this case was in violation of that act.

But I am unable to see any sound distinction between what was done in Loewe v. Lawlor and what was done in the instant case. In Loewe v. Lawlor circulars were sent to dealers for the purpose of intimidating and coercing them into not purchasing from the complainant. In the instant case the plaintiff's customers do not seem to have been to any great extent, if at all, circularized; but organized labor was informed by letters and resolutions that complainant's product was not to be installed and that members of the unions were to use their influence to prevent the placing of orders for the purchase of presses manufactured by it. All organized labor throughout the country was acquainted with the dispute, and instructed not to install the machinery "and if possible influence your employer not to have such machinery installed by unfair men, or that they will not let any more contracts to the Duplex Printing Press Company until organized labor is fairly dealt by"; and the International Association of Machinists' Monthly Journal, which circulated through all the local lodges and on news stands, contained full information as to the attitude of labor toward the complainant and the installation of its presses. The method pursued was intended to prevent the sale of the complainant's product.

In Loewe v. Lawlor, supra, and in Eastern States Lumber Association v. United States, supra, and in Gompers v. Buck's Stove & Range Co. (1911) 221 U. S. 418, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874, the publication and use of letters, circulars, and printed matter were the means resorted to in the attempt to restrain commerce. In the case last cited it is declared that the protective powers of the court extend to every device whereby property is irreparably damaged or interstate commerce restrained; otherwise the law would be made impotent.

In my opinion the things done and threatened to be done by the defendants tend to the destruction of the complainant's interstate trade. Whether an injunction can issue depends upon the construction to be placed upon what is known as the Clayton Act, which was passed by

Congress in 1894. That act modified the Sherman Act in certain important particulars. Under the Sherman Act the opinion prevailed that a private person could not maintain a suit for an injunction to restrain violations of the act, in view of the fact that the act made it the duty of the several district attorneys of the United States in their respective districts, under the direction of the Attorney General, to institute proceedings to that end. 8 U. S. Compiled Statutes Ann. 1916, § 8823. The act (Act Oct. 15, 1914, c. 323), however, expressly provides:

"That any person, firm, corporation, or association shall be entitled to sue for, and have injunctive relief, in any court of the United States having jurisdiction over the parties against threatened loss or damage by a violation of the Anti-Trust Laws," etc.    8 U. S. Compiled Statutes Ann. 1916, § 8835o. p. 9697.

The defendants, however, claim that, while the act authorizes a "person, firm, corporation or association" to sue for injunctive relief, the right to do so is nevertheless restricted by other provisions of the statute, and that it is inapplicable to the facts of this case. The defendants base this claim on the provision contained in section 6 of the act which is found in the margin.[1] That section in effect declares that labor organizations, merely because organized, are not to be held to be illegal combinations or conspiracies in restraint of trade, and that they are not to be restrained from "lawfully" carrying out their "legitimate" objects. In his opinion in the Paine Lumber Co. Case, supra, Mr. Justice Pitney declared that:

"Neither in the  *  *  *  section, nor in the committee reports, is there any indication of a purpose to render lawful or legitimate anything that before the act was unlawful, whether in the objects of such an organization or its members or in the measures adopted for accomplishing them."

It is true this language was used in a dissenting opinion of three of the justices. But the majority opinion indicates that the majority of the justices must have entertained the same opinion, for Mr. Justice Holmes in his opinion states that he is a minority of the court in thinking that upon the facts involved in that case the Clayton Act established a policy inconsistent with the granting of an injunction. The injunction simply was withheld because at the time the decree was entered a private person or corporation could not sue for injunctive relief in that class of cases.

In the same connection attention may also be called to Stephens v. Ohio State Telephone Co. (D. C. 1917) 240 Fed. 759, 771, in which

---

[1] "Sec. 6. That the labor of a human being is not a commodity or article of commerce. Nothing contained in the anti-trust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the anti-trust laws." U. S. Compiled Statutes Ann. 1916, p. 9686.

District Judge Killits passed upon the second paragraph of section 20 of the Clayton Act, which is found in the margin.[2] He there says:

"The statute but enacts the position which courts have universally taken; there is nothing new in it," etc.

It is my opinion that, if the acts complained of in this case would not have been lawful prior to the passage of the Clayton Act, they are not lawful now. The first paragraph of section 20 of the Clayton Act is found in the margin.[2] It relates to injunctions in a case between an employer and employés, etc. So far as the purposes of this case are concerned, it would seem to suffice to say that the parties to this suit do not come within the classification therein named. No one of the defendants is now or ever was an employé of the complainant, and the relief prayed for does not contemplate protection from strikes among complainant's employés engaged in the manufacture of its printing presses. If, however, it be contended that the intention of Congress was that the act should apply to any case growing out of a labor dispute, even though none of the parties defendant had ever been in the complainant's employ, it would not prevent the issuance of the injunction, for it is to be noted that the act does not absolutely prohibit the granting of an injunction, even in cases between an employer and employés.[3] The injunction may still be granted between employer and employés, when "necessary to prevent irreparable injury to property, or to a property right of the party making the application"; and it is so well settled that no citation of authorities is necessary that acts that will cause the destruction of one's property or business, and acts that interfere with the carrying on of one's business, destroying his custom

[2] "And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do; or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States." 2 U. S. Compiled Statutes Ann. 1916, p. 1964.

[3] "No restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney." U. S. Compiled Statutes Ann. 1916, p. 1964.

or his profits, do an irreparable injury and authorize the issuance of an injunction.

The achievement of the end sought by these defendants is not through an appeal to the purchasing public not to buy nonunion-made machines; and the defendants have not confined themselves to withdrawing union men from complainant's factories. The course which has been pursued has made the complainant's presses "a contraband of commerce," "a kind of commercial leper." The plan has been to make complainant's machines unmarketable by preventing their being hauled, installed, operated, or repaired, or even exhibited to the public. If this can be done under the laws of the United States, then it seems that no manufacturer of printing presses in this country can maintain an "open" shop, and no machinist engaged in the manufacture of such presses can earn his living at his trade, unless he consents to join a union, and be bound by all its rules and regulations, and the channels of interstate commerce are practically closed against the products of an "open" shop. If the truckmen are in the unions and cannot handle nonunion goods, of what use is it to ship goods from Michigan to New York? And if the unions have a right to say what goods their members shall handle, or shall not handle, what reason is there for saying that union men employed by the railroads cannot refuse to handle any goods not made in an "open" shop? The railroads are common carriers, it is true; but all the persons who hold themselves out as willing to carry goods for the public, draymen, carters, truckmen, wagoners, and moving van companies, proprietors of taxicabs, omnibuses, and baggage wagons, are in like manner common carriers. 10 C. J. 49. And they may be engaged in interstate commerce, as the goods they carry are being shipped outside the state, or have been shipped into the state to be delivered to the consignees therein.

My Associates do not agree with me in the conclusion at which I have arrived. The reasons for their disagreement will be found in the opinions which follow. Therefore, in accordance with their opinion, and contrary to my own, the decree is affirmed, with costs.

HOUGH, Circuit Judge. The record at bar contains uncontradicted testimony (since defendants offered no evidence) divisible into two parts—one relating to acts of violence and threats of the same, directed against some or all of the persons managing or aiding in plaintiff's business and directly tending to destroy that business through fear of physical injury; the other part showing conclusively (what, indeed, defendants avow) a purpose long formed by the organizations represented only locally by the individual defendant threatmakers, to advise and persuade all workers whose labor would in any way benefit any business effort of plaintiff to abstain from such labor, and further to spread through the purchasing public a knowledge that, if any one bought what plaintiff made, its transportation, erection, operation, and repair would be rendered as difficult for the purchaser or user as the influence of the defendant unions could make it.

This action by the associations that are the real defendants was and is directed against plaintiff in particular, because it manufactures only

one kind of printing press, and is the only maker of such presses which at date of bill filed still refused to unionize its establishment and obey defendants' orders by operating a "closed shop." If there had been more than one similar nonunion factory, all would have been equally obnoxious to defendants, though for very obvious reasons the campaign against numerous open shops would not have been along quite the same lines as that against a single rebel; the larger the party, the more united the majority, the easier it is to dispense with physical force, and rely on the persuasive suggestiveness of numbers. It is also easier to get assistance from other unions in other trades for a powerful and successful organization than for one representing only a minority of workers in its own specialty.

The plaintiff was entitled in· strictness of law to an injunction against the individual men who threatened, suggested, and probably incited actual physical injury. They were also entitled to have prevented the open efforts to break or abort plaintiff's contract with the Exposition Company. The latter wrong, however, was (apparently) stopped partly by temporary injunction and partly by treaty, and there is no continuing business relation between plaintiff and that company; while the acts of violence all occurred years before trial, were not shown to have been more than the result of personal malice or bad judgment on the part of a few defendants then acting as union officials, and all or most of them out of office before the cause was brought on for hearing. Let it be assumed (though not decided) that the comparative antiquity of these wrongful acts and their sporadic nature would not affect the legal rights of plaintiff, yet we think no injunction should issue by reason of them. This opinion is entertained, because plaintiff by its counsel in this court has plainly recognized in the principal point raised by the facts something far and away more important than the attempted muzzling by writ of a few foolish men, who fell back on open threat or secret violence, instead of relying on that social discipline which is the real strength of labor unions, as well as of most other originally voluntary associations of human kind. He has therefore at this bar announced that no injunction was desired, because none would or could be of importance or effect, unless it went on the ground of illegality in the efforts of the defendant associations as such to unionize plaintiff's shop, such efforts consisting in words alone—peaceful enough in their literal meaning but necessarily as minatory in suggestion as the diplomatic note of a great power that it would view with concern that which a weaker neighbor insisted on doing.

Thus the only matter we are asked to consider, and therefore the single point on which we shall express opinion, is whether the secondary boycott, used or attempted by defendants against plaintiff, is in the present state of controlling statutes and decisions unlawful. All substantial efforts to enforce such boycott took place in New York. In so far, then, as what is loosely called common law—i. e., the public policy of a state, as ascertained and announced by its highest court— is concerned, we think the recent decision of Bossert v. Dhuy, 221 N. Y. 342, 117 N. E. 582, fully recognizes and upholds the secondary

boycott as lawful in New York, if unaccompanied by malice, force, violence, or fraud; and, even if so accompanied, what is unlawful is not the essential purpose of advancing the unification and control of a mass or masses of workers in a common field, but the purely accidental and temporary means used for attainment.   This is the very accident we have been so frankly and wisely asked to overlook or disregard on this appeal.   It is not necessary to expand comment on this hold-ing so far as the writer of this opinion is concerned; all that he could say was said in Gill, etc., Co. v. Doerr (D. C.) 214 Fed. 111, a decision cited with apparent agreement in the Bossert Case.

As plaintiff's business is largely interstate, and the attentions paid by defendants to plaintiff consisted essentially in trying to make it im-possible for plaintiff to get its machines from Michigan to New York, or have them used there even if they successfully ran the gauntlet, it seems plain that the defendant associations have agreed to do and attempted performance of the very thing pronounced un-lawful in Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815, and 235 U. S. 522, 35 Sup. Ct. 170, 59 L. Ed. 316.   Therefore such interference with interstate commerce should be enjoined, unless the Clayton Act of October 14, 1914, forbids it.

It is not suggested that any other than sections 6 and 20 of that statute can affect this case, and we feel so assured of the inapplica-bility of section 6 that it is not thought necessary to discuss the mat-ter.   Section 20 applies to cases—

"between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking em-ployment, involving or growing out of a dispute concerning terms or con-ditions of employment."

In such cases the statute proceeds to enumerate as lawful, notwith-standing any earlier statute or decision emanating from national au-thority, every peaceful and all the really important things the defend-ant associations have done.   Thus the question becomes this:   Is the present litigation one between employers and employés, or *an* employer and employés, growing out of a dispute concerning terms *or* conditions of employment?   The answer depends on whether the catalogued injuries are to be permitted only in litigations between an employer or employers and the workmen in (or perhaps lately in) their several establishments, or also in cases, however promoted, when the parties are generically the hired and the hirer, and the dispute even an offshoot or by-blow of the endless quarrel over terms of employ-ment?

The solution of the puzzle raised by a statute so blindly drawn as this one is not easy, and the intimation as to the present division of the Supreme Court on the subject, given (purely obiter) in Paine, etc., Co. v. Neal, 244 U. S. 459, 37 Sup. Ct. 718, 61 L. Ed. 1256, merely adds embarrassment.   There is no ruling decision on the subject, and prognosis as to the probable disposition of the matter in a higher court, based on anything as yet published in the United States Re-ports, would be both unprofitable and improper.   It is necessary to form opinion as upon new matter.

[1] There *was* a dispute, and one concerning conditions of employment, and at plaintiff's Michigan factory, long before this suit was brought, and before the plan of campaign—the boycott, which is the thing really complained of—was seriously attempted. The Machinists' Union created the dispute, by calling a strike at plaintiff's place, if it never existed before; that dispute did relate to conditions of employment, in that every striker and every affiliated machinist disputed the right of plaintiff or any other concern similarly situated to employ any one but a member of the union; and so far as statutory interpretation is concerned it seems immaterial that no more than a trifling proportion of the workers in plaintiff's factory paid any attention to the strike order. The dispute existed, and existed from the beginning, between this plaintiff and the principal defendants, among whom are included by representation the dozen or so obedient union men in the factory. In strict truth this is a dispute between two masters, the union, or social master, and the paymaster; but, unless the words "employers and employés," as ordinarily used, and used in this statute, are to be given a strained and unusual meaning, they must refer to the business class or clan to which the parties litigant respectively belong. We perceive no logical standing ground between this certainly broad meaning, and a holding that, if all one's workmen strike (as they call it), or are summarily discharged (as the paymaster calls it), the usual plaintiff is not an employer, and the frequent defendants are not employés, because the formal relation of master and servant has ended. Yet such an interpretation would take nearly all meaning from section 20, as scarcely could a suit arise to which it would apply.

[2] In so far as courts are permitted to study legislative proceedings and contemporary history for aid in statutory interpretation, we consider it plain that the designed, announced, and widely known purpose of section 20 (perhaps in conjunction with section 6) was to legalize the secondary boycott, at least in so far as it rests on, or consists of, refusing to work for any one who deals with the principal offender. We are earnestly told that this rule gives to the workman the choice of being a pariah or a guildslave, and to the employer a doubtful escape from bankruptcy by the path of commercial servitude. If this be true (and the writer is not disposed to question it) the result is imposed by act of Congress; the remedy is political, not judicial.

LEARNED HAND, District Judge (concurring in result). I think that section 20 of the Clayton Act has legalized secondary boycotts in cases between an employer and employés, and that this was such a case, at least after the strike was declared on August 27. I do not think that the section applies only when the employer is plaintiff and his present or former employés are the defendants. Further, I think that the dispute here under any definition included the conditions of employment. I therefore concur in general in Judge HOUGH'S reasoning and in the result, though I do not concur in all the expressions in his opinion.