DAIL-OVERLAND CO. v. WILLYS-OVERLAND, Inc., et al.

(District Court, N. D. Ohio, W. D.   December 27, 1919.   Supplemental
Opinion, January, 1920.)
No. 212.

1. COURTS ⬸280—JURISDICTIONAL QUESTION MAY BE RAISED INFORMALLY.

A motion attacking the court's jurisdiction, made by defendants who had defaulted, will be considered, since the court will consider jurisdictional questions informally presented.

2. INJUNCTION ⬸101(1)—REMEDY AT LAW FOR STRIKE DISTURBANCES INADEQUATE.

A dealer's complaint against manufacturing and selling corporations, which had agreed to supply it with automobiles, and labor organization, which promoted strike disturbances which interfered with the production of such automobiles, states a cause for equitable relief, where the labor defendants were financially irresponsible and recovery of damages against the other defendants would be difficult, since the dealer's contract excused partial nonperformance if normal production was rendered impossible by any cause.

---

⬸For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. SALES ☞85(2)—CONTRACT EXCUSING PARTIAL NONPERFORMANCE OCCASIONED "BY ANY CAUSE" CONSTRUED.

An automobile sales contract, providing that, if "by any cause" the seller was unable to complete all its contracts, it might prorate the available supply of machines among its customers, refers to causes reasonably beyond the power of the seller to prevent.

4. INJUNCTION ☞63—STRANGER MAY BE RESTRAINED FROM INTERFERING WITH CONTRACTUAL RIGHTS.

Equity has jurisdiction to prevent impairment of contractual rights by a party who is a stranger to the contract and the affairs of either party thereto.

5. INJUNCTION ☞101(1)—PREVENTING STRIKE DISTURBANCES FROM INTERFERING WITH CONTRACTUAL RIGHTS.

Equity has power to prevent members of labor organizations from interfering by means of unlawful strike disturbances with the power of manufacturing and selling corporations to produce and supply automobiles which they had contracted to furnish plaintiff dealer.

6. INJUNCTION ☞114(2)—INDISPENSABLE AND NECESSARY PARTIES IN STRIKE DISTURBANCE CASE.

In a dealer's suit against manufacturing and selling corporations, which had agreed to supply it with automobiles, and members of labor organizations who were interfering with the performance of such contract by strike disturbances, the right of action against the labor defendants is an independent right, and the manufacturing corporation is not an indispensable, or even necessary, party.

7. COURTS ☞317—REALIGNMENT OF PARTIES IN STRIKE DISTURBANCE CASE.

In a dealer's suit against manufacturing and producing concerns, which had agreed to supply it with automobiles, and members of labor organizations, who were interfering with performance of the contract by strike disturbances, any rights of the manufacturing corporation against the labor defendants rest on different grounds than those of plaintiff, and defendant manufacturer need not be aligned as a party plaintiff in testing whether a diversity of citizenship confers jurisdiction.

8. INJUNCTION ☞104—RESTRAINING CONSPIRACY BY STRIKERS INTERFERING WITH INTERSTATE TRADE.

Equity has jurisdiction under the Sherman Anti-Trust Act (Comp. St. § 8820 et seq.) to restrain violent strike disturbances, which reduce the production and interstate supply of automobiles, despite Clayton Act, § 6 (Comp. St. § 8835f), authorizing members of labor organizations to lawfully carry out their legitimate objects, and section 20 (Comp. St. § 1243d), preserving the right of lawful assemblage, etc.

9. INJUNCTION ☞101(3)—RESTRAINING VIOLENT STRIKE DISTURBANCES NOT AFFECTED BY CLAYTON ACT.

The Clayton Act, providing that members of labor organizations shall not be restrained from lawfully advancing the legitimate objects of their organizations, etc., does not preclude an injunction against intimidation, bloodshed, and other violent forms of strike disturbances.

10. WORDS AND PHRASES.—"LOCKOUT" AND "STRIKE."

A "strike" exists where men quit because the employer refuses conditions demanded of him, and a "lockout" where employés refuse to return to work unless the employer meets their demands.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Lockout; Strike.]

11. CONSTITUTIONAL LAW ☞67—DETERMINING WHO ARE EMPLOYÉS UNDER CLAYTON ACT A JUDICIAL QUESTION.

Whether men who had quit work still remained employés, within the Clayton Act, authorizing picketing in disputes betweeen employers and employés, etc., is a question for judicial determination.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

12. INJUNCTION ☞101(2)—WHEN STRIKERS CEASE TO BE "EMPLOYÉS" WITH-IN CLAYTON ACT.

Where a manufacturing plant was successfully operating at full capacity, with more men employed than when a strike had been called seven months previously, *held*, that strikers who still remained out were no longer "employés," within the Clayton Act, authorizing picketing in disputes between employer and employé, etc.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Employé.]

13. INJUNCTION ☞163(7)—MODIFICATION OF ORDER AUTHORIZING PICKETING DURING STRIKE.

Where seven months had elapsed since a strike at an automobile manufacturing concern, and it was operating at full capacity, with an increased number of men employed, *held*, that a provision in a temporary injunction authorizing picketing under certain conditions will be stricken, leaving the labor defendants such rights as they may have under Clayton Act, § 20 (Comp. St. § 1243d).

### Supplemental Opinion.

14. INJUNCTION ☞101(4)—PICKETING PLANT WHICH HAS FULLY RESUMED OPERATIONS AFTER STRIKE RESTRAINED.

Where a manufacturing plant was successfully operating at full capacity, with more men employed than when a strike had been called over seven months previously, and the strike had become a dead issue, *held*, that the continued picketing of the plant had become a mere annoyance and nuisance, which would be restrained.

Suit by the Dail-Overland Company against Willys-Overland, Incorporated, the Willys-Overland Company, Toledo Lodge No. 105, International Association of Machinists, and others. Motion to dismiss for want of jurisdiction overruled, and motion for permanent injunction allowed.

Tracy, Chapman & Welles, of Toledo, Ohio, and F. C. Harding, of Greenville, N. C., for complainant.

Rathbun Fuller and James E. Kepperley, both of Toledo, Ohio, for nonresident defendants.

Daniel L. Cruice, of Chicago, Ill., and Rob. V. Phillips, of Toledo, Ohio, for labor defendants.

KILLITS, District Judge. This cause is before the court upon the motions of the complainant and two nonresident defendants and cross-complainants for a permanent injunction, and also upon the motions of certain defendants, hereinafter described and designated as "labor defendants," to dismiss this cause, first, for alleged want of observance of certain general equity rules (198 Fed. xix, 115 C. C. A. xix); and, second, for want of jurisdiction. We will discuss the motions of the so-called labor defendants first.

The complaint was filed June 5, 1919, by the Dail-Overland Company, a North Carolina corporation, asserting that it is, and for several years last past has been, engaged in the business of selling and distributing exclusively Willys-Overland automobiles in 72 counties of North Carolina and 2 counties of South Carolina, at retail in the immediate vicinity of its place of business, and through agents selected

by it in remoter parts of its territory; that its organization has become specially efficient through its business experience, having been built up with care through the selection of employés; that it has no other business, and that the losses by it anticipated on account of the things in the complaint set up cannot be adequately measured at law, because a continuance of the situation of which it complains entails the complete destruction of its organization and business.

The defendants are Willys-Overland, Incorporated, a Virginia corporation, the Willys-Overland Company, an Ohio corporation, Toledo Lodge No. 105, International Association of Machinists, the Automobile District Council, an association of sundry labor unions, these defendants having their places of business within this district, certain officers of these organzations and leaders of others union organizations, and active members thereof, most of whom are residents of this district. For brevity hereafter we will designate all the defendants in this case, other than the Willys-Overland, Incorporated, the Willys-Overland Company, and the Electric Auto-Lite Corporation, a Delaware corporation doing business in this district, and subsequently, through a cross-complaint, made a party defendant, as the "labor defendants," and for like reason the Willys-Overland, Incorporated, will be designated as "Willys-Overland," the defendant the Willys-Overland Company as the "Overland," and the Electric Auto-Lite Corporation as the "Auto-Lite." Pending this suit the latter corporation has been succeeded by the Willys Corporation; but we will continue the designation of the interest represented by the latter by the original term, the "Auto-Lite."

The complaint alleges that Willys-Overland is the organization through which, throughout the world, automobiles manufactured by the Overland are marketed exclusively; that the Overland has for years manufactured automobiles in large quantities in the city of Toledo; that in the fall of 1918 it announced to the motor trade that it was preparing to and would place upon the market during the year 1919 at least 180,000 automobiles through its said selling organization; that depending upon these assurances, about January 4, 1919, the complainant entered into a contract with the defendant the Willys-Overland for the purchase of 2,400 automobiles to be manufactured for the Willys-Overland by the Overland during the succeeding 10 months, to be delivered in monthly installments as specified under the terms of the contract.

A copy of the contract is attached and made a part of the complaint, marked Exhibit A. For the purpose of this memorandum, it is unnecessary to notice these terms further, except that one of the mutual covenants therein provided that, if the Willys-Overland should be unable "for any cause to procure any automobiles, or automobiles in sufficient quantities to enable it to fill all of its contracts and orders, it shall have the right to prorate among all of its customers," including complainant, "such automobiles as it may be able to procure, based upon the number of automobiles contracted for by them respectively."

The complaint further says that allotments in full, without deduction, of automobiles were made and delivered under this contract for

the first four months of 1919, and that the allotment for the month of May, 1919, had been agreed upon, with certain deliveries thereon already made, and that, depending upon said allotment, the complainant had reallotted and had caused to be engaged and marketed through its territory the automobiles expected to be delivered to it because thereof, and that, because of the defaults by Willys-Overland, further in the complaint set up, complainant had been unable to meet its aforesaid engagements with its customers. It is also alleged that under the contract referred to it bought and kept on hand repair parts in large quantities, to be distributed within its territory for the repair of Overland automobiles, and that, because of the defaults in question, its stock of repair parts had been greatly depleted and its business therein very greatly interrupted and injured. It is further averred: That approximately 97 per cent. of all the automobiles and parts thereof manufactured by the Overland for years past, and, under orders to be filled during the year 1919, sold and engaged to be sold to the various distributors throughout the automobile market, were shipped and were to be shipped in interstate commerce to purchasers beyond the state of Ohio; that, shortly before May, 1919, the labor defendants, among them especially the defendants named as officers of the several organizations made defendants hereto, and other persons whose names were to complainant unknown, entered into an unlawful and wrongful combination and conspiracy in unlawful restrait of trade and commerce in automobiles and parts thereof among the different states of the United States; that in furtherance of said conspiracy the said defendants combined and conspired together to drive out of interstate trade and commerce and to restrain and prevent all interstate commerce in any of the manufactures of the Overland, by hampering, preventing, and interfering with the manufacture, loading, and shipment thereof in interstate commerce, so that such products of the Overland could not become a subject or commodity of interstate trade and commerce, nor enter into interstate competition with the products of other automobile companies located in other states, and that in carrying out the said unlawful combination and conspiracy the said labor defendants made demands upon the Overland for changes in wages, working hours, and conditions which it was well known to the defendant conspirators the Overland could not grant, and at the same time meet the contracts it had theretofore entered into through the Willys-Overland, its selling agent, with its various customers, including complainant, and maintain its business; that to meet said demands would amount to a destruction of the business of the Overland; that said demands were rejected by the Overland; that, although the terms and conditions of employment proposed and maintained by the Overland were satisfactory to the great majority of its employés, on May 5, 1919, the labor defendants induced a minority of the employés of the Overland to refuse to comply with the Overland's regulations, and to stop work before the regular hour for the ceasing of work for the day, and to refuse to return to work upon the conditions of employment established by the Overland; that by violence, intimidation, mobs, and riots these defendants attempted to prevent and did in a large part succeed in preventing the

Overland from employing other persons, instead of its said employés who had ceased to work for it as aforesaid, and that by persuasion, threats, and coercion, still further pursuing the said alleged conspiracy, said labor defendants have sought and are seeking to induce large numbers of the employés of the Overland, who were and are satisfied with the terms and conditions of employment by the latter established, to break their contracts and to refuse to continue in the service of the defendant the Overland, unless the latter should consent to the terms of employment attempted to be imposed by said labor defendants; that by such conduct the labor defendants have prevented the manufacture and shipment in interstate commerce of large numbers of automobiles and automobile parts which the defendant the Overland could and otherwise would have shipped in interstate commerce to various distributors, including the complainant.

That, notwithstanding the controversy aforesaid, the defendant Overland kept its factory open on the 6th, 7th, and 8th days of May, 1919; that on the last-named day, however, as a result of the activities of the alleged conspirators and in further pursuit of their aforesaid conspiracy the labor defendants, and many other persons sympathizing with them, congregated in large numbers about the factory of the Overland, and without restraint by the city authorities took part in such acts of violence thereat as to intimidate the loyal employés of the Overland and to compel the closing of its said factory; that May 26, 1919, the factory was reopened with approximately 1,200 loyal employés; that the number thereof increased each day the factory remained open until June 2, 1919, when over 3,000 employés were at work; that on June 2 and 3, 1919, the said alleged conspirators and many other persons congregated in and about the factory and in the adjoining streets of the city of Toledo in mobs of several hundred to several thousand, and near the homes of employés of said company, stopping street cars and other vehicles in which employés of the Overland and persons desiring to become employés were proceeding to and from its factory, by pulling the trolleys off the trolley wires, and cutting trolley ropes, forcing car crews to open the doors of street cars, thereupon assaulting the employés of the Overland, dragging them or throwing them from the street cars, and beating them and intimidating and injuring them, so that hundreds of them were prevented from going to work at the factory on June 2d, and many more were by said means prevented from going to work on June 3d; that employés were struck and injured by stones, bricks, and other missiles thrown at them, and by assaults with fists and clubs and other weapons, all done by said alleged conspirators or their sympathizers, inspired by said alleged conspirators; that windows of the factory were destroyed by bricks and stones thrown thereat; that policemen of the city of Toledo who were on duty in and about the vicinity of the factory were beaten by bricks, stones, and other missiles employed by the same parties; that these things were done in the presence of a large number of uniformed policemen of the city of Toledo, who "almost without exception took no steps to interfere with said wrongful and unlawful acts of said

mobs, and who on that day made no arrests of anybody concerned in and doing said unlawful acts."

That "a large mob gathered at the numerous gates of the factory of the Willys-Overland Company on the morning of June 2d, in the afternoon of June 2d, at the closing hour, and again at the same hours on June 3d; that many members of said mob were pickets bearing badges showing that they were members of the defendant unions, and that said mobs were made up of members of said unions and their sympathizers and co-conspirators; that members of said mobs, consisting of the persons aforesaid, obstructed the entrance and exits from said factory of said employés, and assaulted and beat such employés on both of said days, and that hundreds of violent acts in violation of the law and in pursuance of the conspiracy aforesaid were committed by said members in the presence of the policemen and chief of police of the city of Toledo, all without any arrests being made, except that on June 3d one member of said mob was arrested." That June 3d, although the police force of the city had been greatly increased, acts of violence increased to such an extent that lives were lost and many people injured, the officers of the city wholly failing to perform their duty to afford protection to the Overland and its employés; that thereupon the officers of the city of Toledo, including the mayor, requested of the Overland that it close its factory because of the inability of the city authorities to protect it and its loyal employés, and that in consequence of such request the Overland again closed its factory on June 3d, and ceased thereafter to admit its employés thereto.

That although complainant served a demand upon the defendant the Willys-Overland, and upon the defendant the Overland Company, that the latter continue in operation and that it demand protection through the courts or otherwise for itself and its loyal employés, no steps were taken by these defendants to secure their rights and the rights of their loyal employés through such means; that the Overland factory has been closed, and that the defendant the Overland Company is unable to resume operations, and that the objects of said conspiracy above set forth have been, for the time being, attained; that because thereof interruption of the supply of automobiles to complainant is causing great and irreparable loss to it, not only in the loss of business, but in the loss of good will and the injury inevitable to its business and organization; that the labor defendants are financially irresponsible; that a judgment against them could not be collected; that the contract it has with the defendant Willys-Overland affords it no adequate remedy at law for damages.

The court is asked, first, that the defendant the Overland Company may be temporarily enjoined and restrained from keeping its factory closed, and from interrupting the manufacture of automobiles by removing its factory from its present location in the city of Toledo, which, it is alleged in the complaint, the Overland contemplates doing because of the attacks upon its business and the inability to receive protection in its rights by the local authorities as above set forth; that the Overland may be ordered and directed to employ a force of employés sufficient to fill complainant's contract with the Willys-Overland, and

that the Willys-Overland be compelled to purchase and deliver to complainant the automobiles to which complainant is entitled under its said contract.

It is further asked that a temporary restraining order be issued against the labor defendants, organizations, officers, and individuals, and all persons in active concert with them, preventing the taking of any further "action or steps of any kind whatsoever in pursuance of the unlawful combination and conspiracy to restrain interstate commerce and for the destruction of the business of the defendant the Willys-Overland Company" as in the complaint set forth, and also restraining said defendants and their sympathizers from congregating at, in, and about the factory of the Overland, and elsewhere on the streets of Toledo, and about the respective homes of the employés of the Overland, and there and elsewhere applying to them offensive epithets, and "from threatening, intimidating, coercing by menacing attitudes, expressions, gestures, or otherwise," said employés and other persons desiring to enter the employ of the Overland from working at the factory of the Overland, and "from assaulting, beating, wounding, abusing, threatening, or otherwise maltreating them, or any of them, and their families or persons connected with them, and from urging or employing or aiding others to do any of said acts and things, and from taking any steps whatsoever to interfere with the manufacture of automobiles" by the Overland, and "from inducing or attempting to induce, or from causing others to induce or attempt to induce, any employé" of the Overland to violate his contract of employment with the latter. A temporary injunction, to be followed by a perpetual injunction for these purposes, is also prayed for.

Twenty-one affidavits were filed with the complaint, testifying to the extraordinary conditions of violence and intimidation attending the operation of the Overland plant at the time, and, in detail, supporting the averments of the complaint respecting the inability and failure of the officers of the law to protect the rights of the Overland and its loyal employés. Notice was immediately given to defendants, including the labor defendants, of the pendency of the application for a temporary restraining order, to be heard June 7, 1919, when, after hearing and conference with all the defendants and their counsel, including the counsel for the labor defendants, a temporary restraining order was issued, which went no farther than to restrain acts of violence and intimidation. Provisions therein were made for picketing the Overland factory under certain restraints imposed by the order, the labor defendants being allowed 50 pickets on duty at a time, intended to fix responsibility for and to identify the authors of disorder and violence.

Subsequently the Willys-Overland and the Overland each answered, admitting the averments of the complaint and declaring the inability of the factory to continue operations under conditions as they existed in the city. By cross-complaint the Overland brought into the case the Electric Auto-Lite Corporation, asserting that the latter manufactured certain essential automobile accessories under contract with the Overland, and that the Overland could not build automobiles without the

product of the Auto-Lite; that the Auto-Lite factory was closed through the same circumstances which operated to close the Overland. The Auto-Lite then answered, admitting the conditions as asserted against it. Each of the three answering defendants demanded relief against the aggressions of the labor defendants.

June 12, 1919, the Overland factory still remaining closed, an order was entered, the essential parts of which we herewith quote:

"This matter coming on to be heard on the special application of the complainant, directed against the defendant the Willys-Overland Company, for an order requiring said defendant to resume the operation of its automobile factory, to the end that said defendant the Willys-Overland Company may comply with the obligations accruing against it by virtue of the contracts exhibited in this cause, the same was heard, present the complainant, by its solicitors, and the defendant the Willys-Overland Company, by its counsel, and the court considered the allegations of the complaint and the testimony, and the defendant the Willys-Overland Company, through its counsel, declaring in open court that so far as its power to comply with the court's order is concerned, its position is fully represented in its answer and cross-petition herein filed, and that it desires to comply with any reasonable order the court may make in the premises, but that it is unable to resume the operation of its plant as matters now are, because its loyal employés and those who would otherwise enter its employment are intimidated and prevented from entering upon and resuming their duties as employés of said defendant because of the violent and riotous conduct heretofore occurring as set up in the pleadings herein filed, and a fear of a recurrence of such conditions.

"The court finds that plaintiff is daily suffering irreparable injury and loss from the failure of the defendant the Willys-Overland Company to place its plant in operation, and that it is necessary for the protection of the interests of plaintiff that said defendant the Willys-Overland Company shall place its plant in operation forthwith.

"It is therefore ordered that the said defendant the Willys-Overland Company be and the same is hereby directed to resume on or before Monday, June 16, 1919, operation of its automobile factory, to the end that it may with no further delay and damage to the complainant fulfill its said contractual obligations with said complainant, and the defendants and each of them in this case, and the officers, agents, employés, and associates of each of said defendants, and all parties acting in concert or participation with each of said defendants and others in the labor dispute now in progress between the said defendant and the Willys-Overland Company, and its late employés, which the court finds to exist and to have been conducted and maintained as set forth in the complaint herein filed, and in the answer and cross-petition of said defendant the Willys-Overland Company, herein filed, are each enjoined and ordered to refrain from doing any act of whatever character tending to illegally interfere with the operation of the automobile factory of the said defendant the Willys-Overland Company, or tending in any degree to intimidate, obstruct, and prevent any person from entering into the employment, or continuing in the employment, of said defendant the Willys-Overland Company, in and about the operation of its said automobile factory as aforesaid, and in this behalf the order in this cause entered on June 9, 1919, and effective as of 2 o'clock of June 10, 1919, is continued in force against each of said defendants, their agents, officers, employés, and associates, and other persons acting in participation and concert with them as aforesaid, as fully and completely and to all intents and purposes as if the same were again herein written.

"Thereupon said defendant the Willys-Overland Company, by its solicitors, in open court stated that the foregoing order of the court could not be complied with, because of the interference with its operations by persons and parties mentioned and described in the answer and cross-bill of the defendant the Willys-Overland Company, in the manner therein set forth, and that by reason of said fact the defendant the Willys-Overland Company will be unable

to and will not itself open its plant for operation at the time hereinabove ordered by the court.

"The court, having considered the foregoing representations of the said defendant, and having conferred with the local authorities of the city of Toledo, and having been assured by them that the city of Toledo is without sufficient actual power to prevent a recurrence of riotous scenes such as have taken place within the said city at various times since May 8, 1919, respecting the efforts of said defendant the Willys-Overland Company to operate its said automobile factory, finds that each and all the representations foregoing are substantially true, and that the exercise of the extraordinary powers of the court is required to make effective the foregoing order, and the court further finds in this behalf that there now exists no military organization under the militia laws of the state of Ohio.

"It is accordingly ordered by the court that because of the failure and refusal of the defendant the Willys-Overland Company to comply with said order to perform the act hereinbefore required to be done by said defendant the Willys-Overland Company, as aforesaid, that Percy O. Jones be and hereby is appointed by the court as chief special officer to take charge of and enforce the opening and operation of said plant, at the cost of said defendant the Willys-Overland Company, for the purpose of performing and carrying out the above order of this court, requiring the opening of said plant and the continuance of the operation thereof, and to carry into effect each and every of the provisions of this order, and to execute with the collaboration of the marshal of this court the aforementioned order of this court entered as of June 9, 1919."

Under this order the factory resumed operations June 13, and has continued uninterruptedly in the manufacture of automobiles to this time. June 18 the temporary restraining order was superseded by the temporary injunction, proceeding substantially upon the lines of the former.

To neither the complaint nor the cross-complaints of the several answering defendants did the labor defendants file pleading or motion of any kind. August 2 a decree pro confesso was entered against them, which stands unmodified, and which the complainant demands shall be made absolute in a permanent decree.

Notwithstanding the default of the labor defendants, the court has from time to time caused informal notice to be given of the pendency of applications affecting the situation, and every important step in the administration of the case has been taken after consultation with all parties and their counsel. The court having directed that informal notice be given to the labor defendants of the application of the complainant, and of the Willys-Overland, and of the Willys Corporation representing the Auto-Lite, all nonresident parties, for a permanent injunction and final decree, the labor defendants appeared with their motions above referred to.

[1] The demand of the labor defendants that the case be dismissed for the alleged reason that the provisions of general equity rule 57 (198 Fed. xxxiv, 115 C. C. A. xxxiv) have not been complied with respecting the continuance of this case from the April to the present October term, we have overruled from the bench, both because of the state of the record and for want of capacity in the movants to demand dismissal of the cause, owing to their default or defense. We held that the pleadings actually filed presented no triable issue on the merits, and that therefore no situation had arisen to which either rule 56, providing for

placing this case on trial docket, or rule 57 was applicable. This cause was in fact continued to the current term under a standing order of continuance. We entertain the motion· attacking the court's jurisdiction, now made and earnestly urged by the defaulting labor defendants, because it is incumbent upon the court to look to its jurisdiction, however informally the latter is challenged. This, however, is the first time anywhere in the proceedings of this case that jurisdiction has been questioned. We proceed as briefly as possible to set forth the considerations which led the court to assume jurisdiction after a study of the complaint, for we have nothing in this record throwing light upon this question, except the complaint itself.

[2, 3] Although it is not questioned in argument by the labor defendants, it is, of course, necessary to inquire whether this is a case for equitable cognizance for want of an adequate remedy at law. The question needs but brief attention. As to the labor defendants, the complaint answers it, for the averment is there made that they are uncollectible in any amount. Regarding the other defendants, under the contract the complainant, we are clear, had the right to demand of the Willys-Overland, and through the latter of the Overland, that all reasonable means be exhausted to maintain the manufacture of automobiles, and that, in default of reasonable diligence in that behalf, complainant would be entitled to relief of some kind. We can see how great and almost insuperable difficulty would confront complainant at law, both in establishing actionable default and in measuring damages, should it proceed against the Willys-Overland for damages for breach of contract. The contract says that, if "by any cause" the Willys-Overland is unable to complete all its contracts, it may prorate among its various customers, including complainant. It cannot be that any conceivable cause would justify a default.

We feel that the construction to be given to the term "by any cause" is that the cause must be one reasonably beyond the power of the Overland to prevent. Some latitude of judgment should be allowed, of course, to the manufacturing company whether operation should be persisted in against the difficulties confronting it; wherefore proof that it was not reasonably diligent would enter the realm of rather vague speculation. On this reasoning it seems that a remedy at law, if it exists at all, would not be "as practical and as efficient to the ends of justice and its prompt administration as the remedy in equity," and that, in view of what is said in the complaint regarding the character of complainant's organization and the nature of complainant's business and the intangibility of the elements of value therein, the damage necessarily flowing from a default would be "of such a nature that it cannot be adequately compensated by an action at law." Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 12, 19 Sup. Ct. 77, 82 (43 L. Ed. 341); Kilbourn v. Sunderland, 130 U. S. 505, 514, 9 Sup. Ct. 594, 32 L. Ed. 1005; Tyler v. Savage, 143 U. S. 79, 95, 12 Sup. Ct. 340, 36 L. Ed. 82, interpreting section 723, R. S. (section 1244, Compiled Statutes). If complainant is entitled to equitable relief of the nature discussed against the Willys-Overland and the Overland, it is plain that those who attempt to prevent the full measure of that relief which

is theoretically possible may be joined in the action. We think this is enough discussion concerning the general equity jurisdiction respecting all the defendants.

Two grounds are especially insisted upon by complainant as supporting the jurisdiction of this court: First, that there is here a diversity of citizenship, this case involving a sum in excess of the jurisdictional amount; and, second, that there is sought here to repress an illegal conspiracy in restraint of interstate commerce. We will discuss these questions in their order. That the amount involved exceeds the jurisdictional minimum is not open to serious dispute.

The first question only is noticed in argument by counsel for the labor defendants. They ignore the second proposition entirely, and on the first they place special emphasis, as if the authority were controlling, upon Hamer v. New York Railways Co., 244 U. S. 266, 37 Sup. Ct. 511, 61 L. Ed. 1125, to the necessity of so rearranging the parties to this case that there would result a destruction of that diversity of citizenship among the parties necessary to jurisdiction. This challenge directs the court's scrutiny of the averments of the complaint to determine therefrom (there is no other source of consideration) whether a rearrangement of parties is reasonably called for by the facts, which would place, as having an interest substantially identical with *all* the interests of the complainant, a party resident in this district.

It is, of course, the Willys-Overland Company, which we designate for brevity as the Overland, which the labor defendants assert should be aligned with complainant, for Willys-Overland, Incorporated, and Electric Auto-Lite Corporation are nonresidents. For the purposes of this case it seems to us that the court is entirely justified in considering that the complainant has contractual relations with the Overland, although its contract directly is with the Willys-Overland. The privity of the Overland to this selling organization, the Willys-Overland, respecting the contract, is so clearly set up in the complaint that preciseness of discussion prompts, as well as justifies, us to consider the situation as if complainant's contract were directly with the manufacturing company.

[4, 5] So treating the situation, we find the complainant to be in the position of one seeking to preserve his contract with another from impairment through the unlawful acts of a third person, *stranger both to the contract and to the affairs of either party thereto.* This is a matter of equitable cognizance. The principle has been applied to a very great variety of cases, and the distinction between a case of this character and those like Dawson v. Trust Co., 197 U. S. 178, 25 Sup. Ct. 420, 49 L. Ed. 713, and Hamer v. Railways, supra, is well illustrated in Mahon v. Trust Co. (C. C. A. 7th) 239 Fed. 266, 269, 270, 152 C. C. A. 254, where the criteria differentiating the two lines of cases are discussed. In a large and controlling measure the present case is within the authority and responds to the reasoning of Carroll v. Chesapeake & O. Coal Agency Co., 124 Fed. 305, 312, 61 C. C. A. 49; Carter v. Fortney (C. C.) 170 Fed. 463, affirmed Fortney v. Carter, 203 Fed. 454, 121 C. C. A. 514. The differences between the pending case and cases like that decided by Judge Evans in 239 Fed. 266, 152 C. C. A. 254, "are

radical," as our Circuit Court of Appeals recently said in comparing the facts in the Carroll Case, supra, with those before it in Iron Moulders' Union v. Niles-Bement-Pond, 258 Fed. 413, —— C. C. A. ——, reversing (D. C.) 246 Fed. 851. In the case in the Seventh Circuit (239 Fed. 266, 152 C. C. A. 254, supra) the mortgagee complainant had a right of action precisely on same grounds which defendant mortgagor enjoyed against its codefendant, a distinguishing feature from the present case. Judge Evans, for the Court of Appeals, notes (239 Fed. 270, 152 C. C. A. 258) that an independent right of action exists, even to a mortgagee, "to restrain threatened injury to the security by trespassers or other tort-feasors, and where the threatened injury *is by outsiders*, strangers to the affairs and contracts of the mortgagor."

In connection with the decision of the Sixth Circuit Court of Appeals in the Niles-Bement-Pond Case, we note Judge Knappen's opinion in West v. United States, 258 Fed. 413, —— C. C. A. ——, wherein it is disclosed that, in the court's view, the bill in the Niles-Bement-Pond Case contained averments sufficient to clothe the District Court with jurisdiction, and that it was upon the final hearing only that the deficiency of jurisdiction was disclosed. In the present case the bill's averments sustain jurisdiction much more cogently than in the Niles-Bement-Pond Case, and no final hearing has been had, and no procedure taken which weakens the jurisdictional averments of the bill. A long line of authorities sustains a right of action directly against a third person to restrain the inducing of a breach of contract which complainant has with another. Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031; Friedberg v. McClary, 173 Ky. 579, 191 S. W. 300, L. R. A. 1917C, 777, and notes 782; Beckman v. Marsters, 195 Mass. 205, 80 N. E. 817, 11 L. R. A. (N. S.) 202, 122 Am. St. Rep. 232, 11 Ann. Cas. 332. There can be no distinction in principle between a right of action founded on an attempt to *induce* a breach of contract and an attempt by force or violence to bring about the same result.

[6, 7] From the authorities referred to, it seems clear that a right of action between the complainant and the defendants, who are alleged to be fomenting a strike by violence, is stated in the bill, one which is independent of any right of action in the Overland, which was not, therefore, an indispensable or even a necessary party. In such a case, its presence as a made party does not defeat jurisdiction. Brown v. Denver Omnibus & Cab Co., 254 Fed. 560, 166 C. C. A. 118. The cases cited support the point that the criterion is not merely that the complainant and that defendant who, it is alleged, should be aligned with complainant, have an interest of the same quality in the result prayed for, but it is whether they are privileged to assert their respective interests upon the same grounds. Undoubtedly complainant and the Overland have a lively interest in preventing violence to promote the strike, but their respective rights to demand relief are dependent upon very different considerations. The bill also indicates clearly an adversary relationship between the Overland and complainant. The latter, as one sustaining damage as a result of the Overland's determination of the course it should follow in its difficulties, had the right to demand

judicial inquiry into the reasonableness of the Overland's judgment. The contract gave neither Willys-Overland nor the Overland final authority to say, against complainant, that a cause existed sufficient to exonerate them from the obligations of the contract. The mandatory order of June 12th appears very clearly to be the logical end of a substantial dispute between the parties. In Hamer v. Railways, supra, the case of all others upon which the labor defendants rely, the criteria upon which the decision as to this point proceeds are thus stated:

"3. The Affiliation of the Trust Company.—It is clear that the interest of the Trust Company in this controversy lies wholly with the plaintiffs. This is shown, among other things, by the request in its answer that the relief prayed for in the bill be granted. No reason is assigned in the bill or in the answer of the Trust Company for its refusal to sue, and none suggests itself save the willingness of an accommodating trustee to enable its beneficiaries to present that appearance of diversity of citizenship essential to conducting this litigation in the federal court. It is not contended that this refusal to sue makes the Trust Company an adversary to be classed for purposes of jurisdiction with the real defendants—as in those cases where the refusal to sue was part of a fraudulent participation in the wrongdoing, and where the trustee or corporation in effect ranged itself in opposition to the relief sought. The Trust Company having, as we have shown, a real interest in the controversy, which makes it a necessary party to the suit, must be aligned as a party plaintiff, where its interest lies."

The very first sentence of this quotation is inapplicable to the facts before us. It is not necessarily or even inferentially true that the interest of the Overland in this controversey "lies wholly" with the complainant. It is very easy to see how the Overland, consulting its own convenience only, might well decide that the best course for it was something else than an immediate resumption of operation. Successful manufacturing, against the conditions of difficulty, such as here, to obtain and keep skilled labor, to build an organization of employés out of the chaos made of its normal force, because of the events of the previous four weeks, was indeed a question, the answer to which it might well, in its own interest, refuse to undertake by immediate experimentation, even under this court's protection, the efficiency of which remained to be proved.

The answer of the Overland, in distinction from that of the Trust Company in Hamer v. Railways, supra, does offer reasons why it refuses to obey complainant's demands. It cannot be said of the Overland that there may be seen, either in the complaint or in its answer, "the willingness of an accommodating" party "to enable its beneficiaries to present that appearance of diversity of citizenship essential to conducting this litigation in the federal court." The fact that the Overland should be satisfied to enjoy the relief coming to it if its contractor should invoke the successful operation of a federal court's protective power is not enough to charge it with collusion with the latter in bringing this action or even to require it to be aligned with the latter. Venner v. Great Northern R. Co., 209 U. S. 24, 32, 28 Sup. Ct. 328, 52 L. Ed. 666. In this case, as shown by the averments both of the complaint and the Overland answer, the latter is yielding to the conditions illegally created for it by the labor defendants. So far as complainant's right of individual action is concerned, there can be

no difference in such a situation from that created by fraud, as alleged in the Venner bill. It cannot be assumed that the Overland shut down its factory after two attempts to operate, that an appearance might be created to justify intervention by a customer such as complainant. The admitted facts suggest that it fought earnestly against, and finally yielded to, great odds, at the suggestion of local authorities.

[8, 9] Complainant is not here seeking relief upon the same grounds which the Overland might occupy should it appeal to a court. Unless the law was modified by the passage of the so-called Clayton Act (Act Oct. 15, 1914, c. 323, 38 Stat. 730), it must be held that the complaint states a cause of action of conspiracy, reprehended by the Sherman Act of July 2, 1890, c. 647 (Comp. St. § 8820 et seq.), under the authority of Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815, and Gompers v. Buck's Stove & Range Co., 221 U. S. 418, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874. On page 438 of the latter decision (31 Sup. Ct. 497 [55 L. Ed. 797, 34 L. R. A. (N. S.) 874]) the court says:

"The court's protective and restraining powers extend to every device whereby property is irreparably damaged or commerce is illegally restrained. To hold that the restraint of trade under the Sherman Anti-Trust Act, or on general principles of law, could be enjoined, but that the means through which the restraint was accomplished could not be enjoined, would be to render the law impotent. * * * But the very fact that it is lawful to form these bodies [labor organizations], with multitudes of members, means that they have thereby acquired a vast power, in the presence of which the individual may be helpless. This power, when unlawfully used against one, cannot be met, except by his purchasing peace at the cost of submitting to terms which involve the sacrifice of rights protected by the Constitution, or by standing on such rights and appealing to the preventive powers of a court of equity. When such appeal is made, it is the duty of government to protect the one against the many, as well as the many against the one."

The acts charged against the alleged co-conspirators in this case to have been in contemplation as agencies to effect the conspiracy, and also committed to further that conspiracy, were morally much more reprehensible than those charged against the alleged conspirators in the cases cited; also in the present case the labor defendants are charged with conspiring to induce the employés of the Overland to break their contracts with the latter. Consequently the case is within the scope of Hitchman Coal Co. v. Mitchell, and Eagle Glass & Mfg. Co. v. Rowe, reported in 245 U. S. 229, 38 Sup. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461, and 245 U. S. 273, 38 Sup. Ct. 80, 62 L. Ed. 286, respectively.

Does the Clayton Act change the law in any way, so as to affect the application here of the cases above cited? We are unable to see that it does, for we see nothing in this case that brings into pertinency the statement with which section 6 of that act (Comp. St. § 8835f) begins, "that the labor of a human being is not a commodity or article of commerce"; nor are the other provisions of section 6 applicable here. We are not asked here "to restrain individual members of such organizations [labor organizations and others named] from *lawfully* carrying out the *legitimate objects thereof*," nor are we asked to declare the labor organizations named as defendants in this case "to be illegal

combinations of conspiracies in restraint of trade." The things which the labor defendants are alleged to have in mind to accomplish the purposes of their alleged conspiracy, and the things which are alleged to have been done in furtherance of that conspiracy by way of overt acts, cannot, by the wildest stretch of imagination, be considered to be "lawfully carrying out the legitimate objects" of such organizations. Intimidation, violence, bloodshed, cannot be said to be lawful means to the effecting of legitimate objects of a labor organization, nor can it be said that the acts alleged to have been in contemplation and to have been put in practice as agencies of the alleged conspiracy were remotely within the privileges of peacefully persuading and lawfully assembling accorded to persons engaged in a labor controversy by section 20 of the Clayton Act (Comp. St. § 1243d).

It seems very clear that, giving to that act a construction most favorable as "labor's bill of rights," and, consequently, as an act discriminatory in favor of a certain class of citizens, still what is imputed as in the mind and action of the labor defendants in this case cannot be within its purview. These defendants are here admitting by their default every well-pleaded averment of this complaint. If the complaint pleads a conspiracy to interfere illegally with interstate commerce (and it does), they admit the charge. Their motion requires us to construe this pleading, as far as we reasonably can, against them. The court is forced, therefore, in light of the authorities cited, to hold that it had jurisdiction of this case under Act July 2, 1890 (the Sherman Act), because it is asked, upon sufficient averments, to restrain an unlawful interference with interstate commerce from which plaintiff specially suffers. Paine Lumber Co. v. Neal, 244 U. S. 459, 37 Sup. Ct. 718, 61 L. Ed. 1256; Act Oct. 15, 1914 (Clayton Act) § 17. This conclusion is not at all in conflict with the majority opinion in Duplex Printing Press Co. v. Deering, 252 Fed. 722, 164 C. C. A. 562, because this is not a case in which nothing more is involved than the so-called secondary boycott, peacefully conducted. We hold, therefore, that this court had jurisdiction of this case on each ground advanced by complainant.

[10-13] Before the motions for a permanent injunction is finally passed upon, the court should consider, in its own interest, whether conditions which were by it created by the temporary restraining order and by the temporary injunction should be preserved through the final order. This involves some further consideration of the so-called Clayton Act, which is popularly assumed to have given what is indefinitely called "labor" certain immunities not enjoyed by any other class. We do not so read the act. Stephens v. Ohio State Telephone Co. (D. C.) 240 Fed. 759–771. Section 20, which is said to grant the alleged discrimination, seems to us but a statement of rights common to all classes of citizens. The right to "peaceable" pursuit of his freedom of action is as sacred to the loyal employé as to the "striking" employé—to the "boss" as to the organizer of his men, and we think "labor" gets nothing out of the section, except what it always has had, and which should be given it at all times without statutory declaration. But if we are wrong in this construction, and should assume

that it does enlarge "labor's" rights beyond previous limitations, then it must follow that whether that difference exists which brings the alleged discrimination into operation is a question of fact, to be finally determinable only by public agencies organized for the decision of questions of fact. The law thus construed applies only when a fundamental fact exists. The court may act within certain limitations, as provided in section 20, when a case exists "between an employer and employés * * * involving, or growing out of, a dispute concerning terms or conditions of employment."

Sometimes that condition is obvious, to be judicially noticed, as in the present case, when the court acted. There was last June a real labor dispute at the Overland. But it cannot be, in any approved system of law enforcement, or of government, that final and exclusive determination of the existence of any condition which brings into activity a law changing relationships of persons or organizations rests with a private individual or with an unofficial organization of individuals. If a law grants any association or class of individuals special privileges, the final decision whether the discrimination operates is for a judicial tribunal, not for representatives of the favored class. The latter may act on the assumption that the condition exists, and the law protects them if their assumption is reasonably founded; but it is never their privilege to say with authority that a condition, once existing, still obtains. The court may override their assumption and finally decide that the condition has disappeared. That is precisely the case here. In June the Overland was closed because of a strike and a "lockout"; the latter being, after all, but euphemism for a strike.

The only difference between a "lockout" and a "strike" is a difference of position, as we understand it. A strike exists where men quit their work because their employer refuses conditions demanded of him, and a lockout exists where employés refuse to return to work unless the employer meets their demands. In either case it is the employé who decides what he ought to do.

In May last year a number of men left their work (struck, in fact) 36 minutes earlier than the quitting time which the Overland fixed, and the next day they refused to return to work until their employer sanctioned their right to end the day at the time at which they acted the day before. Thus the dispute arose, of the merits of which we have never entertained any opinion, and into which we have never attempted to examine. The court has, however, acted to insure the conduct of the controversy without violations of law, seeking only the preservation of good order. Our order made part of its conditions the terms of the Clayton Act, and we allowed picketing at the plant under such sanctions, respecting both parties, as would tend to identify authors of disorder if any occurred. It is a matter of extreme gratification to the court and the proper subject of self-congratulation to all parties concerned that in the six months which have elapsed there has been a minimum of disorder, but one case considered worthy of punishment and that an aggravated one.

Does there still exist a "dispute concerning terms or conditions of employment" between the Willys-Overland Company and its employés?

What are the obvious facts? When the dispute arose May 5, 1919, the plant had 12,842 employés. It continued in operation for three days, with a greatly reduced force, closing May 8 because of the unrestrained violence to which its loyal employés were subjected. May 26 it resumed operations, continuing with a force augmented to a little over 20 per cent. of normal, until June 2, when again violence of extreme character forced it to comply with the request of the local authorities to close. June 13 operations were resumed under the mandatory order of this court, enforced by our special officer. The initial working force was 1,276. This number of employés has steadily increased, until, on December 20, the day these motions were submitted, 13,556 persons were at work, an increase of more than 700 over the number at work more than seven months ago, when were last at work the persons who are represented in this case by the labor defendants and in whose behalf "picketing" is still carried on. The plant is in successful operation, turning out more machines daily than ever before.

As long as conditions are such that what is called a "settlement" might seem reasonably possible between the company and its late workmen, the latter, it seems, should be considered "employés," within the meaning of that term in the Clayton Act. But when the controversy has reached a practical end, there is no reason why the term "employé" should not be held to its ordinary meaning of one who actually works for hire for another and under the latter's control. It is obvious that the Willys-Overland Company, which refused to "settle" last May with "employés" represented by the labor defendants here, preferring to endure the hardships which the dispute then entailed, will not "settle" now, when, with no assistance whatever, except the enforcement of its right to operate without unlawful interference, it has built up a working force greater than that from which those "employés" of last May seceded. The circumstances force the court to find, as we do, that no "employés" not actually at work in the plant of the Overland are now entitled to special consideration of this court; that those who, because of adherence to their own ideas of how their late employer's business should be conducted, have chosen to remain off the Overland pay roll for more than seven months, no longer are entitled to be called "employés" of this company; that no dispute, such as existed in May and June last, longer continues between the Overland and any persons entitled to be considered as the company's employés. We cannot recognize the right of individuals to prolong, long after its substance has fled, a labor controversy, and to demand that it be accorded special consideration as a real and substantial industrial dispute, with advantages to them derivable from a law said to discriminate in favor of their class if certain conditions exist.

The situation on the picket lines established by the court now suggests nothing more real, dignified, or effective than a heckling and nagging of employés who enter the plant, some of whom are exhibiting a natural impatience with the futile and irritating activities of the pickets. The court's observation suggests that the time has come when the semblance of indorsement of picketing, which may seem to exist

in the fact that it proceeds under this court's order, should be removed. We ought not to leave a record open to the imputation that activities which amount to mere teasing of the company and its employés is indorsed by the court. We are impressed with the feeling, substantiated by reports which come to us, that at any time the annoyance which picketing naturally gives to the employés of the company may be resented by the latter, and the court may therefore be called upon to consider some conflict between pickets and workmen, on the theory that the former should be protected by the court; in fact, that proposition has been advanced several times in the past. The court owes it as a duty to itself, therefore, to relieve the record of the imputation that picketing, under present conditions, is sanctioned by the court, preserving to the defendants those rights which they undoubtedly have without specific judicial grant—that liberty of action and speech at all times and places which is ordered by law. As we understand the spirit of our institutions, no other variety of freedom or liberty is enjoyed by any one.

This court has repeatedly in this case disclaimed a judgment that picketing per se was lawful. It was ordered and allowed in this case as a convenient means of stabilizing a very uncertain situation, providing a concrete expression, at the Overland factory, of rights declared by section 20 of the Clayton Act, and to fix responsibility, if those rights were exceeded or infringed. The immediate reason for fixing the terms of picketing, and thus apparently approving of it, having disappeared, there is no reason in allowing it to continue as a court provision.

The motion to dismiss this case for want of jurisdiction is overruled. The motion for a permanent injunction is allowed. Before the same is entered, however, the court desires conference with the parties to this case, including the labor defendants, with a view of adjusting the matter of costs, which should be disposed of in the final decree. That conference will be called as soon as the court's engagements permit. If at the time the decree is ready for entering picketing continues upon the lines heretofore occupied, the final order will definitely abrogate the apparent privilege of picketing.

## Supplemental Opinion.

Since the filing of our memorandum of December 27, 1919, in which it was intimated that organized picketing at the Overland plant should cease, the labor defendants have continued the practice with a rather flamboyant air, as if enjoying an unrestrainable right to do, in that behalf, just as they please. We had hoped, vainly it seems, that they would sense the realities of the situation, as did every one else knowing the facts, and embrace the opportunity the court offered, in deferring final action, to retire gracefully from a field no longer theirs to occupy. Their persistence makes it necessary, however, to provide, in the final decree filed with this memorandum, that picketing at the Overland plant, as defendants have conducted it since last June, shall be discontinued. In the temporary injunction, now superseded by a permanent order, we made as part of its terms a paraphrase of that

part of section 20 of the so-called Clayton Act (Act Oct. 15, 1914), which protects peaceful persuasion and peaceable assembly. The order proceeded then to prescribe a system of picketing at the plant of the company which the labor defendants might follow to get the benefit of the provisions taken from the Clayton Act.

By order of the court these pickets were organized, and arrangements were made to so identify them that, if any one exceeded the liberty of peaceful action, and thus violated the injunction order through intimidating practices, the offender might be known. We limited the number of pickets at the plant to 50 on duty at any one time, and the number at any one gate to 6, and then restricted the company to the number of gates it might keep open. The labor defendants asked us for the privilege of using 250 pickets at one time, with a maximum limit of 30 at any gate. This the court refused, for reasons explained in a memorandum filed at the time. The court's advices suggest that the plan worked very satisfactorily. Except for a few days, a picketing force was not employed in the aggregate as large even as the court allowed, and, in spite of the unusual tensity and exceedingly difficult situation which previous occurrences in this controversy had created, there was a minimum of trouble.

A careful retrospect of the history of this case fails to disclose any restraint by the court imposed upon any right preserved by any law to the labor defendants. There was no hampering of lawful conduct by them whatever. Control against intimidation was provided for; that is all. All the court did was to order—and take precaution to insure obedience to its order—that the breaking of heads, the destruction of property, the atrocious invasions of rights sanctioned by plainest law, which disgraced the city of Toledo during the previous five weeks, should cease; that the dispute which the labor defendants had engendered May 5th, and which inspired atrocities which for more than a month thereafter had submerged law and order in Toledo, should thenceforth proceed to its solution in peace, and solely on whatever real merits it had. That is absolutely all the court provided for; anything to the contrary is absurd rhetoric, appeal to hysteria, malicious or ignorant.

[14] We have recently discussed the fact that the defendant the Willys-Overland Company has made steady and rapid headway against the opposition of the labor defendants, until more than a month ago both its working force and its daily production exceeded the maximums when the dispute arose. This increase of both force and production has been maintained since our last memorandum. The blunt truth is that the revolt against their employer of certain Overland employés, which arose seven months ago, has failed of its purpose to influence the company's policy respecting terms and conditions of employment. It is the plainest fact—appreciated everywhere, whether acknowledged or not; whether the truth is unpalatable to any one or not—that the "strike" or "lockout" has long since ceased to be anything else than an ineffective protest against the Willys-Overland Company by persons which that company may or may not heed, as it pleases.

It follows that it cannot be fairly said that there is now existing a

real controversy, or one which any court is bound to honor, over questions which caused the trouble early in May of 1919. As we have suggested in an earlier opinion, it cannot be tolerated that a few men, either from pride of office in their respective organizations or otherwise, or from sheer willfulness, may indefinitely parade the ghost of a dead contest and claim the special consideration which might possibly have been given them and those they claimed to represent when the dispute had vitality. Our notion is that the court is called upon to—in fact, common sense dictates that it should—treat the situation much more stringently and differently, under circumstances which now attend this cause, than it should do under those which confronted the court when the temporary injunction was issued. If, last June, there were to be equitably granted the labor defendants a privilege of picketing, it was allowable because of conditions which existed then but which, since, have wholly vanished. The foundation for the privilege of picketing of the character the court has permitted having collapsed, no matter what a few men who assume to be leaders of the labor defendants think about it, there is nothing to support it.

We are therefore enjoining the continuance of picketing at the Overland plant. That term, as applied to circumstances such as we have here, and as describing conditions which we think the court should not permit to continue, may be defined as the congregation, from time to time, of two or more persons at or near the plant of the company under the appearance of concerted action, or as resulting from organization, to maintain indefinitely a system of patrolling the immediate vicinity of the entrances of the plant, that the individuals entering and departing therefrom may be spied upon and accosted in a manner suggesting a purpose to embarrass in any way either the owners of the factory or those who persist in remaining in or engaging in employment at such factory, or to influence or persuade, by argument or action, any employé in such factory to violate his contract of employment. Included in this definition, as equally obnoxious to the law and consequently subject to restraint, is the creation and maintenance of an organization to do the things we have just described. The facts before the court show that the conduct of the labor defendants and their representatives, under consideration, is within the foregoing definition—that picketing is maintained and carried on for these objectionable purposes, and that it is the outward manifestation of the object of an organization maintained by the labor defendants.

Many courts have discussed this difficult question, and there has been disagreement as to how far the injunctional arm should go. The lack of apparent harmony in reported decisions is due altogether to the fact "that it is not always easy to determine exactly when peaceable persuasion ceases and intimidation commences." Every court recognizes that "picketing" suggests aggression—that in it is always a hint of unlawful interference with rights entitled to protection. In Tri-City Council v. Foundries Co., 238 Fed. 728, 732, 151 C. C. A. 578, a decision going as far as any case of which we know in refusing restraint of picketing, such relief as this court is allowing is approved. We need no extensive citations. The case just referred to cites many.

It is sufficient, in addition, to refer to Jensen v. Cooks' & Waiters' Union; 39 Wash. 531, 81 Pac. 1069, 4 L. R. A. (N. S.) 302, and notes; Pope Motor Car Co. v. Keegan (C. C.) 150 Fed. 148; and the cases discussed in these opinions. All reported decisions, however, consider conditions when a labor controversy was acute.

We have no disposition to recede from the position taken by this court in Pope Motor Car Co. v. Keegan, supra, wherein the late Judge Tayler, in our opinion, stated the law so clearly as to anticipate, in every essential respect, the saving provisions of section 20 of the Clayton Act. But we do not have now a situation which was before us in June when we allowed picketing, or which was before the court in the Pope Case. The dispute before us now is not even a moribund one. With the Overland Company having a greater force of employés and turning out more automobiles than it ever did in its history, the controversy must be said to be long defunct; an inquest was called for long ago. It follows very clearly that, at this time, picketing of any kind must be considered to be nothing else than a purposeful annoyance, a continuing nuisance. It is entirely clear that it can accomplish nothing else than the gratification of aggravated feelings which were engendered when passions were hot and ambitions rampant last May, or the saving of the faces of those who led or encouraged the breach at that time. Such picketing, under the circumstances present here, is restrainable and will be prohibited.